Rockingham
No. 90-401

RONALD C. COAKLEY
AND
COAKLEY LANDFILL, INC.

v.

MAINE BONDING AND CASUALTY COMPANY
AND
ST. PAUL FIRE AND MARINE INSURANCE COMPANY

November 25, 1992

*Hamblett & Kerrigan, P.A.*, of Nashua (*Timothy G. Kerrigan* on the brief), and *Goodwin, Proctor & Hoar*, of Boston (*James J. Dillon & a.* on the brief, and *Nancer Ballard* orally), for the plaintiffs.

*Wiggin & Nourie*, of Manchester (*Edward L. Cross, Jr.* on the brief), and *Wiley, Rein & Fielding*, of Washington, D.C. (*Thomas W. Brunner & a.* on the brief, and *Laura A. Foggan* orally), for the defendant Maine Bonding and Casualty Company.

*Morrison, Mahoney & Miller*, of Boston (*Michael F. Aylward* on the brief and orally), for the defendant St. Paul Fire and Marine Insurance Company.

*Ouellette, Hallisey, Dibble & Tanguay, P.A.*, of Dover (*Stephen H. Roberts* on the brief), by brief for Aetna Casualty & Surety Company, as *amicus curiae*.

*Merrill & Broderick*, of Manchester (*Richard C. Nelson* on the brief), and *Drinker Biddle & Reath*, of Philadelphia (*James M. Sweet* and *Paul McDonald* on the brief), by brief for American Motorists Insurance Company, as *amicus curiae*.

*Hibbard & Spinella, P.A.*, of Concord (*Frank P. Spinella, Jr.* on the brief), and *Covington & Burling*, of Washington, D.C. (*William H. Allen & a.* on the brief), by brief for Business and Industry Association of New Hampshire & a., as *amicus curiae*.

*Finis E. Williams, III*, of Concord, by brief for Hitchiner Manufacturing Company, Inc., as *amicus curiae*.

*McLane, Graf, Raulerson & Middleton*, of Manchester (*Thomas J. Donovan* on the brief), and *Warner & Stackpole*, of Boston (*Ralph T. Lepore, III & a.* on the brief), by brief for Insurance Environmental Litigation Association, as *amicus curiae*, jointly with *Green,*

*McMahon & Heed*, of Keene (*Douglas F. Green* on the brief), and *Gaston & Snow*, of Boston (*James P. Whitters, III* on the brief), by brief for Peerless Insurance Company, as *amicus curiae*.

*Orr and Reno Prof. Assoc.*, of Concord (*R. James Steiner* on the brief), and *Nutter, McClennen & Fish*, of Boston (*Stephen J. Brake* on the brief), by brief for K.J. Quinn & Co., Inc., as *amicus curiae*.

*Sheehan, Phinney, Bass & Green P.A.*, of Portsmouth (*Michael C. Harvell & a.* on the brief), by brief for New Hampshire Ball Bearings, Inc., as *amicus curiae*.

*Sanders and McDermott*, of Hampton (*Mark E. Beliveau* and *Lawrence M. Edelman* on the brief), *H. Bernard Waugh, Jr.*, of Concord, and *Anderson Kill Olick & Oshinsky*, of Washington, D.C. (*Jerold Oshinsky* and *Geri L. Weiseman* on the brief), by brief for The New Hampshire Municipal Association & a., as *amicus curiae*.

*John P. Arnold*, attorney general (*Leslie J. Ludtke*, assistant attorney general, on the brief), by brief for the State, as *amicus curiae*.

JOHNSON, J. The central issue in this appeal is whether the defendants, Maine Bonding and Casualty Company (Maine Bonding) and St. Paul Fire and Marine Insurance Company (St. Paul), must indemnify the plaintiffs, Ronald C. Coakley and Coakley Landfill, Inc. (collectively, the Coakleys), for environmental "response" costs imposed or likely to be imposed by the United States Environmental Protection Agency (EPA) and the New Hampshire Department of Environmental Services (NHDES) pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.A. §§ 9601 *et seq.* (1983 & Supp. 1992) (CERCLA), and comparable State statutes, RSA chapter 147-B (1990 & Supp. 1991). The Superior Court (*Hollman*, J.) granted the defendants' motion for summary judgment below, ruling that the word "damages," found in the granting clause of the defendants' comprehensive general liability policies, does not include these response costs. In addition, the court ruled that the EPA and NHDES demands concerning Coakley Landfill, contained in "notices of potential responsibility" and other letters, are not "suits," and that therefore the defendants are not bound to defend the Coakleys. The Coakleys appeal both rulings and we reverse.

Coakley Landfill, the focal point of this dispute, straddles the border of Greenland and North Hampton. For many years, it accepted

municipal and industrial waste from the Portsmouth area, as well as incinerator residue from the Pease Air Force Base. In 1984, the Coakleys were forced to close the landfill after the NHDES discovered contaminants in the area's groundwater and in the wells of neighboring properties. The contamination also forced surrounding municipalities to extend water supply distribution lines to service the residents who had depended on the well-water.

In 1984, the environmental protection division of the State Attorney General's office notified Ronald Coakley that he was "potentially responsible" for the contamination at the Coakley Landfill and asked him to fund and help conduct a "Remedial Investigation/Feasibility Study" (RI/FS) of the site, at an expected cost of at least $500,000. The division warned that "EPA is prepared to initiate the RI/FS process whenever it appears that our cooperative effort will not succeed." It appears that the Coakleys chose not to heed this warning because the EPA eventually conducted an RI/FS itself. The cost of the RI/FS and other landfill-related investigations exceeded $1,225,000.

In September 1987, the EPA sent Ronald Coakley a "Request for Information" about the landfill. The letter stated that compliance with the request was mandatory, and subject to a $25,000 penalty for each day of non-compliance. The record does not disclose whether the Coakleys complied with this "request." Next, in May 1989, the NHDES ordered Mr. Coakley to cover all ash piles at the landfill and post warnings to prevent public access. Again, it is unclear from the record whether the Coakleys performed these tasks.

Finally, in February 1990, the EPA sent Coakley Landfill, Inc. a "Notice of Potential Liability." The notice warned that, under CERCLA, a potentially responsible party (PRP) could be obligated to (1) "implement relief actions deemed necessary by EPA to protect the public health, welfare or environment"; (2) pay "for all costs incurred by the government in responding to any release or threatened release at the [landfill]"; and (3) "pay damages for injury to, destruction of, or loss of natural resources." In addition, the notice demanded that Coakley Landfill, Inc. pay the $1,225,000 already incurred by the EPA and requested that Coakley Landfill, Inc. "voluntarily perform or finance the response activities described below that EPA has determined are required at the [landfill]."

The "response activities" referenced in the EPA's PRP notice consist of "[d]esign and implementation of the Remedial Action selected and approved by EPA for the [landfill]" and "[o]peration, maintenance and monitoring necessary at the [landfill]." As of February

1990, the EPA's proposed "Remedial Action," or "Preferred Alternative," included "placing a cap over the landfill to minimize the migration of contaminants from the landfill" and "collection and treatment of groundwater to remove and prevent further migration of contaminants." This containment and cleanup plan, bearing an estimated cost of $20,200,000, represents a compromise between less expensive, less environmentally protective plans and more costly, more protective ones.

Attached to the PRP notice was a list of parties identified by the EPA as potentially responsible for the contamination at the landfill. The EPA made the list available to each entry on the list "to further the settlement negotiations and to encourage communication among the parties." The notice, however, made clear that "[i]nclusion on or exclusion from the list does not constitute a final determination by the Agency concerning the liability of any party for the hazard or contamination at the [landfill]."

In the midst of all this agency activity, the Coakleys contacted two of their insurance carriers, Maine Bonding and St. Paul, and requested coverage for any costs they might be forced to bear in connection with the EPA and NHDES demands. The relevant portion of the carriers' comprehensive general liability policies, purchased by the Coakleys, reads as follows:

> "The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as damages* because of
> A. bodily injury or
> B. property damage
> to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any *suit* against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any *claim or suit* as it deems expedient . . . ."

(Emphasis added.) Similarly, the pertinent part of Maine Bonding's excess (umbrella) liability policies, also purchased by the Coakleys, reads:

> "The Company will indemnify the Insured for ultimate net loss in excess of the retained limit which the Insured by reason of liability imposed upon the Insured by law or assumed by the Insured under any contract or agreement, shall be-

come legally obligated to pay *as damages* because of Personal Injury Liability or Property Damage Liability or Advertising Offense Liability to which this policy applies, caused by an occurrence. . . .

When underlying insurance does not apply to an occurrence:

With respect to any occurrence not covered by underlying insurance, but covered by this policy except for the amount of retained limit, the Company will, in addition to the amount of the ultimate net loss payable:

(1) defend any *suit* against the Insured seeking damages on account of personal injury, property damage or advertising offense, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any *claim or suit* as it deems expedient . . . ."

(Emphasis added.) The carriers either refused to respond to the Coakleys' request or refused coverage, and this declaratory judgment action ensued.

Maine Bonding and St. Paul each filed motions for summary judgment. St. Paul's motion was confined solely to the two main questions we address here on appeal—the interpretation of the words "damages" and "suit"—and explicitly reserved other, more fact-based coverage issues. The Coakleys objected to both motions on the grounds "that there are genuine issues of material fact as to whether [the carriers] must provide insurance coverage to [the Coakleys] under the terms of its insurance policies and, therefore, [the carriers are] not entitled to judgment as a matter of law." The Coakleys then filed their own motions for summary judgment, alleging that: "(1) the government demands are 'suits' triggering [the carriers'] duty to defend [the Coakleys]; and (2) the government-demanded response costs are sums payable as 'damages' within the meaning of the [carriers'] policies." Relying on *Desrochers v. Casualty Co.*, 99 N.H. 129, 106 A.2d 196 (1954), and on dictionary definitions, the superior court granted the carriers' motions for summary judgment and denied the Coakleys' motions. This appeal followed.

The issues presented by the parties on appeal are narrow and limited:

1. Are response costs, including the costs of complying with an injunction and reimbursing the EPA for its expenditures, covered as "damages" by the carriers' insurance policies?

2. Are the EPA's and NHDES's demands "suits" for purposes of triggering the carriers' duty to defend the Coakleys?

3. If this court reverses the rulings of the trial court on the issues of "damages" and "suit," are the Coakleys entitled to summary judgment?

4. Is the Coakleys' petition for declaratory judgment time-barred?

The fourth issue was not addressed in the carriers' briefs and was only cursorily mentioned during St. Paul's oral argument. We therefore decline to review it. *See Aubert v. Aubert*, 129 N.H. 422, 428, 529 A.2d 909, 913 (1987) ("Arguments not briefed are waived on appeal.").

Preliminarily to the "damages" issue, we note that the parties and *amici curiae* have deluged the court with arguments, citations, references, and exhibits. No small forest fell to deliver their contentions to our steps. In particular, counsel have consumed reams of paper in an effort to focus our attention on the workings of the numerous other jurisdictions forced to interpret the term "damages" in the CERCLA context. Neither side of the issue appears to enjoy a clear majority, although state adjudicators evidently tend towards granting coverage. *See AIU Ins. Co. v. FMC Corp.*, 274 Cal. Rptr. 820, 829–30, 799 P.2d 1253, 1262–63 (Cal. 1990) (citing cases). We acknowledge that the issue before us is in many ways identical to the one decided by these foreign courts, but emphasize that, like those courts, we must decide our case on the basis of State law and State rules of construction. We therefore eschew a detailed survey of out-of-state decisions and instead center our inquiry on our own precedent, using the arguments of other courts only as occasional guides.

■■ The "damages" issue presents a question of contract interpretation, and "[i]n general, the rules governing the construction and interpretation of written contracts apply with equal force to insurance policies. Thus, in interpreting contracts, the fundamental inquiry centers on determining the intent of the parties at the time of agreement. Any determination of intent is generally made by this court." *Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 770, 423 A.2d 980, 984 (1980) (citations omitted). The burden of proof here is on the insurance carrier. RSA 491:22-a.

■ An insurance contract is interpreted according to state law, and where judicial precedent clearly defines a term at issue, we need

look no further than that definition. *Cf.* 13 J. APPLEMAN & J. APPLEMAN, INSURANCE LAW AND PRACTICE § 7404, at 339 (1976) (if policy terms have clear meaning by judicial decision, they are not ambiguous). If no such definition exists and the contract itself contains no explanation of the term, we construe the policy "in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." *Aetna Insurance Co. v. State Motors,* 109 N.H. 120, 125, 244 A.2d 64, 67 (1968).

■ Where the policy's terms are unambiguous, the language "must be accorded its natural and ordinary meaning." *Trombly,* 120 N.H. at 771, 423 A.2d at 984 (quotation omitted). But where the language is ambiguous, and one possible interpretation favors coverage, we resolve the ambiguity in favor of the insured. *Id.* at 772, 423 A.2d at 985. In *Smith v. Liberty Mut. Ins. Co.,* 130 N.H. 117, 122, 536 A.2d 164, 166 (1987), we elaborated: "[T]he category of ambiguity subject to *Trombly's* rule of construction should not be restricted to terms that reasonably and actually give rise to disagreement between the contracting parties, but should include all terms about the meaning or application of which reasonable disagreement between the contracting parties is possible." And in *Gagnon v. N.H. Ins. Co.,* 133 N.H. 70, 75, 573 A.2d 137, 140 (1990), we stated that an insured may take advantage of our ambiguity rule if the party's circumstance comes within any one of the possible meanings of the terms at issue.

■ The reasons for the ambiguity rule are two-fold. First, "it is the insurer who controls the language of the policy and, therefore, any resulting ambiguity should be resolved in favor of the insured." *Trombly,* 120 N.H. at 771, 423 A.2d at 984; *see Commercial Union Assurance Cos. v. Gollan,* 118 N.H. 744, 745–46, 394 A.2d 839, 841 (1978). Second, "since the object of the contract is to provide protection for the insured, the construction that best achieves this purpose should be adopted." *Trombly,* 120 N.H. at 771, 423 A.2d at 985. The one exception to the rule is that a term in a contract already clearly defined by judicial decision cannot be considered ambiguous. 13 APPLEMAN, *supra* § 7404, at 339.

Armed with these standards of construction, we proceed with our analysis. We look first to the seminal case of *Desrochers v. Casualty Co.,* 99 N.H. 129, 106 A.2d 196, as both parties argue that it dispositively defines "damages" in their favor. *Desrochers* involved an insurance policy with language similar to that at issue here. The underlying dispute arose when the plaintiffs blocked a town culvert, causing the neighboring property to flood. The neighbors sued the

plaintiffs, and the plaintiffs were ordered to remove the obstruction and to pay $200 for injury to the flooded property. Although the plaintiffs' insurance carrier agreed to indemnify them for the $200, it refused to pay for the costs of complying with the injunction.

The court decided the case in favor of the insurance carrier, holding that the costs of complying with the injunction did not constitute "damages." "Damages," the court stated, "are recompense for injuries sustained." *Desrochers*, 99 N.H. at 131, 106 A.2d at 198. "They are remedial rather than preventive, and in the usual sense are pecuniary in nature. The expense of restoring the plaintiff's property to its former state will not remedy the injury previously done, nor will it be paid to the injured parties." *Id.* at 131–32, 106 A.2d at 198 (citation omitted). Furthermore, the court reasoned, "the cost of removing the obstruction has no relation to the amount of damages which might result to adjoining premises if the obstruction should not be removed." *Id.* at 133, 106 A.2d at 199.

The court also rejected an argument that the injunction was a substitute for future damages, for which the plaintiffs would be liable every time the neighbors' land flooded. "The defendant's [insurance carrier's] liability under [the policy]," the court explained, "is limited to the payment of sums which the plaintiffs became legally obligated to pay while the policy was in effect. . . . Consequently the affirmative relief could not be a 'substitute' for any monetary damages for which the defendant was liable." *Desrochers*, 99 N.H. at 133, 106 A.2d at 199. Based in part on this policy limitation, the court denied coverage.

We find the *Desrochers* case, a pre-*Trombly* decision in which the question of ambiguity is never addressed, to be inconclusive authority for the issue before us. *Desrochers*' definition of "damages" as "recompense for injuries sustained" is far from clear in the context of CERCLA and RSA chapter 147-B response costs. *See* 13 APPLE-MAN, *supra* § 7404, at 339. Moreover, while some of the statements explaining that definition help the Coakleys' case, others hurt it. For example, the cost of cleaning up the contaminated groundwater is undoubtedly "remedial rather than preventive," *Desrochers*, 99 N.H. at 131, 106 A.2d at 198, as is reimbursement of that portion of the EPA's investigatory costs necessary to a cleanup, *cf. U.S. Fidelity and Guaranty Co., Inc. v. Johnson Shoes, Inc.*, 123 N.H. 148, 461 A.2d 85 (1983) (finding coverage for party sued for reimbursement of cleanup costs). The same cannot be said, however, of the proposed containment cap, a predominantly preventive measure, and those investigatory costs related to the cap. Moreover, while reimbursement

of response costs is directly "pecuniary in nature," *Desrochers*, 99 N.H. at 131, 106 A.2d at 198, an injunction is not.

In the Coakleys' favor, we note that neither insurance carrier has argued that a policy limitation such as the one used by the *Desrochers* court could be used here to dispel the argument that the injunction was a substitute for a future damages action. *See Desrochers*, 99 N.H. at 133, 106 A.2d at 199. The substitution argument is persuasive here: an EPA injunction to clean up the groundwater is an alternative to a monetary damages action for injury to the groundwater, *see* 42 U.S.C.A. § 9607(a)(4) (Supp. 1992); *Desrochers*, 99 N.H. at 132–33, 106 A.2d at 198–99, the measure of which would likely be the cost of cleaning up the contamination, *see* 42 U.S.C.A. § 9607(f)(1) (Supp. 1992); *Ohio v. United States Dept. of Interior*, 880 F.2d 432, 446 (D.C. Cir. 1989) (42 U.S.C.A. § 9607(f)(1) "carries in it an implicit assumption that restoration cost will serve as the basic measure of damages in many if not most CERCLA cases").

■ Similarly, the cost of cleaning up the contamination, including related investigatory costs, *cf. Johnson Shoes*, 123 N.H. 148, 461 A.2d 85, is directly related "to the amount of damages which might result" to the groundwater if the groundwater is not cleaned up. *Desrochers*, 99 N.H. at 133, 106 A.2d at 199; *see Moulton v. Groveton Papers Co.*, 114 N.H. 505, 513, 323 A.2d 906, 911 (1974) (where "there is a reason personal to the owner for restoring the original condition" of property, cost of restoration is a proper measure of damages, even if greater than the diminution of property's value); *see also* RSA 481:1 (New Hampshire groundwater "constitutes a limited and, therefore, precious and invaluable public resource"). The damage has already been done to the groundwater, and thus the cost of cleaning it up would likely be the same as the amount of "damages" which have resulted. *See* 42 U.S.C.A. § 9607(f)(1) (Supp. 1992); *Ohio v. United States Dept. of Interior*, 880 F.2d at 446. The cost of constructing the preventive containment cap and related investigatory costs, however, are not related to the amount of "damages" which have resulted and thus do not easily fit into the *Desrochers* definition of "damages."

We briefly note that St. Paul attempts to justify its reliance on *Desrochers* by comparing the cost of cleanup with the amount of "damages" suffered by the *landfill* property. *See Desrochers*, 99 N.H. at 133, 106 A.2d at 199 ("the cost of removing the obstruction has no relation to the amount of damages which might result to adjoining premises if the obstruction should not be removed"). We can-

not dispute St. Paul's argument that there is no relation between the two, but point out that it is not the damage to the landfill that is at issue here, but the damage to the groundwater, a unique and irreplaceable government resource. *See* RSA 481:1; *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng. Co.*, 326 N.C. 133, 143–46, 388 S.E.2d 557, 563–64 (1990) (state's interest in protecting natural resources is a property right; contamination of state groundwater is "property damage" within the meaning of standard comprehensive general liability policy).

A look at a post-*Desrochers* case lends additional support to the Coakleys' arguments for coverage of the costs of cleaning up the groundwater, including related investigatory costs. *State v. Charpentier* "involve[d] the liability of a landowner . . . for the cost of cleaning a hazardous waste dump located on her property. . . ." *State v. Charpentier*, 126 N.H. 56, 58, 489 A.2d 594, 596 (1985). We stated that "[t]he present action was brought by the State . . . to recover *damages* for the cost of cleaning up the Gilson Road dump site, which now contains large quantities of hazardous chemical wastes." *Id.* at 59, 489 A.2d at 597 (emphasis added). Throughout the opinion, we referred to the action as one for "damages."

The Coakleys cite *Bagley v. Controlled Environment Corp.*, 127 N.H. 556, 503 A.2d 823 (1986), to support their argument for coverage of all costs of complying with an EPA injunction, including the costs of building a containment cap, and not just the costs of cleaning up the groundwater. *See id.* at 563–64, 503 A.2d at 828 (stating that RSA 147-A:9 (Supp. 1983) provides that an operator who disposes of hazardous waste in violation of RSA chapter 147-A shall be strictly liable for costs of "containment, cleanup and removal"; statute "is a provision for damages"). The Coakleys, however, misread *Bagley*. That case involved RSA chapter 147-A, which regulates hazardous waste management. This case involves RSA chapter 147-B, regulating hazardous waste cleanup. Moreover, the Coakleys' interpretation of *Bagley* would ignore the remedial versus preventive distinction made so plain in *Desrochers*. *Desrochers*, 99 N.H. at 131, 106 A.2d at 198. We therefore decline to accept their reading of *Bagley*.

From the foregoing, it appears that, but for the non-pecuniary nature of an injunction, *Desrochers* and *Charpentier* would support coverage for the cost of cleaning up the contaminated groundwater and related investigations, although not for the cost of building the containment cap and its related investigations. *See Desrochers*, 99 N.H. at 131–32, 106 A.2d at 198 ("damages" are "pecuniary in nature"; plaintiffs' injunction not "damages" in part because costs of

compliance will not "be paid to the injured parties"); *cf. Johnson Shoes*, 123 N.H. 148, 461 A.2d 85 (finding coverage for party sued for *reimbursement* of cleanup costs). The *Desrochers* "pecuniary in nature" limitation apparently would allow coverage only if the EPA cleaned up the contaminated groundwater itself and demanded reimbursement from the Coakleys. If the Coakleys, and not the EPA, perform the cleanup, they would pay the costs of the cleanup *directly* to an engineering firm, instead of *indirectly*, through the federal and State governments.

We reject as specious this distinction between direct and indirect payment. It should make no difference in terms of insurance coverage whether the engineering firms hired to clean up the polluted groundwater receive their money from the Coakleys or from the federal or State government. Direct payment is in a "real sense equivalent" to indirect payment, *see Desrochers*, 99 N.H. at 133, 106 A.2d at 199, because either way, the damage to the groundwater is repaired. Moreover, if we were to allow coverage only when the EPA performs the cleanup, we would encourage parties such as the Coakleys to ignore EPA cleanup demands and court injunctions, at an added cost to the environment, the insurance companies, and the public. *See, e.g., AIU*, 274 Cal. Rptr. at 845, 799 P.2d at 1278.

We disapprove the apparent distinction found in *Desrochers* between direct and indirect payment, and find that the case, along with *Charpentier*, otherwise supports coverage of remedial, though not preventive, response costs, including reimbursement of investigatory costs related to the cleanup. We acknowledge that *Desrochers* does not clearly define the terms at issue, however. *Cf.* 13 APPLEMAN, *supra* § 7404, at 339. We therefore proceed for additional support to examine the insurance policies, which themselves contain no definition of "damages," for the term's plain and ordinary meaning. *See Trombly*, 120 N.H. at 770, 423 A.2d at 984.

The insurance carriers, Maine Bonding and St. Paul, insist that the plain and ordinary meaning of the word "damages," as found in their insurance policies, includes neither injunctive relief nor restitution, such as reimbursement of the money spent on investigative costs. We disagree. As Maine Bonding argues in its brief, the distinctions among "legal damages," "injunctive relief," and "restitution" are alive and well in the legal field, *see, e.g., United States v. Long*, 537 F.2d 1151, 1153 (4th Cir. 1975) (distinguishing restitution from monetary damages), *cert. denied*, 429 U.S. 871 (1976), and are probably still taught in remedies courses in most American law schools. The average insured, however, has not attended law school, much

less a law school remedies class. To discover the plain and ordinary meaning of "damages" in the absence of a clear definition from *Desrochers* or the insurance policies, we turn not to the distillation of a law student after a semester's worth of course work, but to the word's plain and ordinary meaning as understood by a layperson of average intelligence. *See Trombly*, 120 N.H. at 770, 423 A.2d at 984; *Gollan*, 118 N.H. at 745, 394 A.2d at 841.

Webster's defines "damages" as "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 571 (unabridged ed. 1961) (WEBSTER'S). This definition is similar to the one found in *Desrochers*, 99 N.H. at 131, 106 A.2d at 198 ("recompense for injuries sustained"), and is just as unhelpful in the CERCLA and RSA chapter 147-B context. The distinctions among injunctive relief, restitution, and traditional legal damages that the carriers insist are so obvious here elude us. *See A.Y. McDonald v. Ins. Co. of North America*, 475 N.W.2d 607, 619–21 (Iowa 1991). The carriers apparently apply their technical, legal explanations of "compensation," "satisfaction," and "reparation" to this dictionary's definition of "damages," but we must look to the words' plain and ordinary meanings. *See Trombly*, 120 N.H. at 770, 423 A.2d at 984.

"Compensation," a synonym for "recompense," WEBSTER'S, *supra* at 1897, means "the act or action of making up, making good, or counterbalancing: rendering equal." WEBSTER'S, *supra* at 463. "Reparation" means "the act of making amends, offering expiation, or giving satisfaction for a wrong or injury." WEBSTER'S, *supra* at 1923. One sense of the word "satisfaction" is "the discharge of a legal obligation." WEBSTER'S, *supra* at 2017. The first part of the dictionary definition of "damages," "reparation *in money*," excludes injunctive relief by its very terms, but the second part does not. WEBSTER'S, *supra* at 571. To the extent there is any conflict between the two or ambiguity, we must of course accept the interpretation that affords coverage. *Gagnon*, 133 N.H. at 75, 573 A.2d at 140. Consequently, we focus our attention on the second part of the definition—compensation or satisfaction imposed by law for a legal injury.

An EPA-ordered cleanup injunction, as well as reimbursement of related investigatory costs, easily fit this second part of the definition. They both qualify as the discharge of a legal obligation, and they both make up, or make good, for the legal injury the Coakleys are accused of committing—the contamination of the groundwater. If an administrative order requires the Coakleys to both comply with

such an injunction and reimburse the EPA for its investigatory costs, the order will be "compensation or satisfaction *imposed by law*."

It follows then that cleanup costs and reimbursement for related investigatory costs satisfy the plain and ordinary definition of "damages." If insurance carriers wish to limit coverage to non-injunctive, non-restitutionary costs, they are free to do so in plain, intelligible language. *See Gollan*, 118 N.H. at 748, 394 A.2d at 842 ("An exclusion must explain those distinctions material to suspension of coverage to be operative.").

■ On the other hand, containment costs, including related investigatory costs, do not fit the definition because they are not "compensation or satisfaction imposed by law for *a wrong or injury* caused by a violation of a legal right." The hazardous waste sought to be contained within the landfill has not yet injured the groundwater. The containment plan is thus essentially preventive and, as *Desrochers* explained, "damages" are "remedial rather than preventive," *Desrochers*, 99 N.H. at 131, 106 A.2d at 198.

The carriers argue that our interpretation of "damages" in essence reads the word right out of the insurance policy, making it mere surplusage. Our resolution of the issue, they insist, makes an insurance carrier responsible for payment of *all* sums an insured is legally obligated to pay, not just those which the insured is obligated to pay as "damages." We disagree. Our determination does not strip the word "damages" of all meaning; to the contrary, it refines the definition to include only those costs which are remedial, not preventive. Moreover, we have already stated in the insurance context that "damages" may exclude interest. *Nat'l Grange Mut. Ins. Co. v. Smith*, 133 N.H. 279, 281, 574 A.2d 1386, 1387–88 (1990) (where policy expressly distinguishes between "damages" and "interest," "damages" excludes "interest"). Consequently, it does not convert the word "damages" into mere surplusage to say that it limits an insured's coverage to those costs which the insured is legally obligated to pay to satisfy a wrong or injury. *See* WEBSTER'S, *supra* at 571.

■ The carriers also contend that CERCLA itself distinguishes between "damages" and injunctive relief or restitution, thus supporting the argument that the word "damages" excludes the costs of complying with an injunction or reimbursing the EPA. *See, e.g.*, 42 U.S.C.A. §§ 9607(i), 9613(a) (1983 & Supp. 1992). We reject this contention for two reasons. First, assuming *arguendo* that the parties could have foreseen the passage of CERCLA, we cannot believe that

any of them divined the wording of the statute at the time they signed the insurance policy. Second, we decide an insurance dispute on the basis of State law, *see, e.g., AIU*, 274 Cal. Rptr. at 838, 799 P.2d at 1271, and State rules of construction, not on the basis of federal law. CERCLA may be the immediate source of this controversy, but its use of the word "damages" has nothing to do with our interpretation of the word found in the insurance policies at issue here.

We next turn to the question whether Maine Bonding and St. Paul must defend the Coakleys against the actions of the EPA and NHDES. The carriers argue that there is no duty to defend because none of the agency actions to date initiated a "suit" within the meaning of the word as it appears in the insurance policies. There are no cases in New Hampshire in point, and therefore we turn to the language of the policy to determine its plain and ordinary meaning. As the carriers point out, while the policies do not define "suit," they do distinguish between "claim" and "suit," *requiring* a defense only in the case of a "suit." Therefore, their argument goes, a "suit" must be more than a "claim." We have no quarrel with this reasoning, but cannot agree that the agency actions here are necessarily merely "claims" and, thus, not subject to the defense requirement.

To determine the plain and ordinary meaning of the word "suit," as understood by a layperson of average intelligence, *see Trombly*, 120 N.H. at 770, 423 A.2d at 984, we look again to the dictionary. Webster's gives several definitions for the word, the two most relevant being: (1) "the attempt to gain an end by legal process: prosecution of a right before any tribunal"; and (2) "an action or process in a court for the recovery of a right or claim: a legal application to a court for justice." WEBSTER'S, *supra* at 2286. If the agency actions fit either of these definitions, then our ambiguity rule requires that we hold in favor of the Coakleys. *See Gagnon*, 133 N.H. at 75, 573 A.2d at 140; *Trombly*, 120 N.H. at 772, 423 A.2d at 985.

A close look at the EPA's PRP notice, as well as relevant portions of CERCLA, reveals an agency action that fits the first definition above. The PRP notice, like a civil complaint, alerted the Coakleys that the EPA had begun a legal process to conclusively and legally determine, subject only to review for abuse of discretion, *see* 42 U.S.C.A. §§ 9604(c)(4), 9613(j)(2), 9621 (Supp. 1992), the appropriate "response activities" liable parties must perform or pay for to abate the pollution at Coakley Landfill. *See Hazen Paper Co. v. United States Fidelity & Guaranty Co.*, 407 Mass. 689, 697, 555 N.E.2d 576, 581 (1990). This determination is akin to the determination of "damages" in a tort suit.

While it is true that the PRP notice does not purport to establish the Coakleys' liability for the pollution, CERCLA liability is strict and has few exceptions. *See* 42 U.S.C.A. § 9607 (Supp. 1992). The predominant question under CERCLA is not *whether* a PRP is liable, but rather *for how much. See Hazen Paper*, 407 Mass. at 695–97, 555 N.E.2d at 581–82. One would not expect a traditional tort defendant to concede the "damages" portion of a case, and it likewise would be myopic to conclude that the Coakleys' rights are not substantially determined by the administrative process described in the PRP notice. *See id.* We therefore find that the EPA's action fits the first definition of "suit" listed above. As the process falls within one possible meaning of the word "suit," we interpret it as such and need not examine the second definition described above. *See Gagnon*, 133 N.H. at 75, 573 A.2d at 140; *Trombly*, 120 N.H. at 771, 423 A.2d at 985.

■ The NHDES administrative order, compelling Ronald Coakley to perform certain remedial tasks, also satisfies the "suit" requirement. It hardly needs saying that an administrative order manifests an "attempt to gain an end by legal process." WEBSTER'S, *supra* at 2286; *see Spangler Constr.*, 326 N.C. at 154–55, 388 S.E.2d at 570. Administrative proceedings are the equivalent of court proceedings for purposes of the "suit" requirement, *see* 7C J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4682, at 25 (W. Berdal ed., 1979), and an administrative order quite obviously indicates that an administrative proceeding is under way.

Finally, we address the Coakleys' argument that if we hold in its favor on the "damages" and "suit" issues, as we have, they are entitled to summary judgment. They contend in their brief that while the carriers' objections to their motion for summary judgment referred to "affirmative defenses," "neither [the carriers'] opposition nor their affidavits raised any factual questions regarding those 'affirmative defenses,'" contrary to RSA 491:8-a, IV ("the adverse party may not rest upon mere allegations or denials of his pleadings, but his response, by affidavits or by reference to depositions, answers to interrogatories, or admissions, must set forth specific facts showing that there is a genuine issue for trial").

■ We dismiss this argument as unreviewable. Nowhere in the parties' voluminous briefs and appendices appear the insurance carriers' objections to the Coakleys' motion for summary judgment. We cannot review the Coakleys' argument about the objections' deficiencies unless we have the objections before us to scrutinize. *See Macie-*

*jczyk v. Maciejczyk*, 134 N.H. 343, 344, 592 A.2d 1140, 1141 (1991) ("our review is limited to errors apparent on the record available to us").

 Even if the Coakleys' description of the carriers' objections to their motion for summary judgment were accurate, however, we would dismiss this argument as waived. The insurance carriers' own motions for summary judgment were limited to the "damages" and "suit" issues. The Coakleys objected to these motions in part because "there are genuine issues of material fact" and then filed their motions for summary judgment. The motions addressed the same issues—concerning the interpretation of "damages" and "suit"—found in the carriers' motions, and no others. Now the Coakleys argue that, for purposes of deciding their motions for summary judgment, there were no issues of material fact and, therefore, they are entitled to summary judgment given our disposition of the two legal issues. This argument is inconsistent with their earlier position, and consequently we do not accept it.

 For the foregoing reasons, we hold that remedial, "response" costs, imposed by the EPA under CERCLA and by the NHDES under RSA chapter 147-B (1990 & Supp. 1991), including the costs of complying with a cleanup injunction and reimbursing the EPA for related investigatory costs, are "damages" for purposes of coverage under the carriers' comprehensive general liability and excess liability policies. Although it appears from the record before us that certain costs, such as the cost of constructing the containment cap, do not fall within the definition of "damages," while other costs do, we recognize that these issues were not directly argued or decided in the superior court. Given the procedural posture of this case, we do not here finally determine whether any particular cost constitutes "damages" as we have defined them in this opinion; we leave such disputes to be resolved in the first instance by the superior court. Further, we hold that the EPA's PRP notice and the NHDES's administrative order satisfied the policies' "suit" requirement. We remand for proceedings consistent with this opinion.

*Reversed and remanded.*

BROCK, C.J., with whom THAYER, J., joined, dissented; the others concurred.

BROCK, C.J., dissenting: The majority goes to great lengths to find insurance coverage for the response costs incurred by the EPA. Be-

cause I cannot agree with the majority's characterization of CERCLA response costs, or with the majority's forced interpretation of the term "damages" as it is used in the comprehensive general liability (CGL) policies, I must dissent.

A claim by the EPA to recover the costs it incurs in responding under CERCLA to a release of hazardous waste pollution is not a claim for damages. In the legal sense, it is a claim for equitable restitution. In a more common sense, it is a claim by the EPA seeking reimbursement for the money it spent on behalf of the responsible parties by taking the initiative in responding to a release of hazardous waste pollution, instead of waiting for the responsible parties to comply with EPA directives by taking action themselves. Regardless of how the response costs are viewed, they are not the kind of expenses for which the Coakleys are insured under their CGL policies.

The EPA is authorized under CERCLA to direct the cleanup and prevention of hazardous waste pollution in this country. *See* 42 U.S.C.A. § 9604(a)(1) (Supp. 1992). In the case of a release of hazardous waste pollution, the EPA may order the responsible parties to take specific remedial actions, *see* 42 U.S.C.A. §§ 9604(a)(1), 9606(a) (Supp. 1992), and may enforce these orders in federal district court. *See* 42 U.S.C.A. § 9606(a)–(b) (Supp. 1992). Because of the severity and immediacy of the hazardous waste pollution problem in the United States, and because of the inherent difficulty and substantial cost in remedying sites of hazardous waste pollution, CERCLA also authorizes the EPA to execute its own cleanup measures, to remedy and prevent releases of hazardous substances, and then to recover the costs of response from the parties deemed responsible under CERCLA for violating EPA pollution standards and creating the hazard. *See* 42 U.S.C.A. §§ 9604, 9607(a)(4)(A)–(B), 9621(a) (1983 & Supp. 1992).

Expenses incurred in response are the costs of complying with the directives of a regulatory agency. This cost of compliance remains the responsibility of the responsible parties regardless of whether the EPA orders the cleanup of the hazardous pollution, or whether the EPA, itself, responds to the pollution release. When the EPA decides to respond itself, it confers a benefit upon the responsible parties by performing a beneficial service and saving the parties the cost thereof. When the EPA seeks reimbursement of its response costs under subsection 9607(a)(4)(A) (Supp. 1992), it is seeking restitution for the unjust enrichment received by the responsible parties

in the form of avoided expenditures. *See* RESTATEMENT (SECOND) OF RESTITUTION § 3, at 43 (Tentative Draft No. 1, 1983).

In no way can response costs be characterized as damages in the sense of a traditional tort recovery. Nor can CERCLA be interpreted as creating a new cause of action under which the federal government may sue hazardous waste polluters. CERCLA, itself, specifically distinguishes between the recovery of response costs and the recovery of traditional tort damages to compensate an injury to natural resources. Subsection 9607(a)(4) (Supp. 1992) of CERCLA provides that responsible parties will be liable for:

"(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and]

. . .

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss."

The term "natural resources" is defined as "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States . . . any State or local government, any foreign government, [or] any Indian tribe." 42 U.S.C.A. § 9601(16) (Supp. 1992).

The distinction between response costs and damages clearly indicates that CERCLA was not intended to create a comprehensive damages remedy for governments involved in hazardous waste pollution cleanup. The damages provision of section 9607 applies only in cases of actual injury to resources in which a government holds an actual interest. The fact that the EPA expends money conducting remedial measures to clean up pollution on privately owned property is not enough to give the United States grounds to recover damages. It may only seek reimbursement of its response costs.

The State of New Hampshire, by its own laws, does hold all of the groundwater in the State in trust for the benefit of its citizens. RSA 481:1. Presumably, the State could recover damages under subsection 9607(a)(4)(C) (Supp. 1992) for the actual injury to the groundwater held in trust caused by the release of pollution at the Coakley landfill. Such an action, however, would be distinct from the claim made by the EPA that is the focus of this present dispute. The plaintiffs' liability in this case is for the reimbursement of response costs

incurred by the EPA. To establish this liability the EPA did not have to hold an interest in any polluted natural resources, nor did it have to allege any injury. It had to show only that an unjust benefit was conferred upon the responsible parties when the EPA had to take affirmative steps to execute its own directives for the public welfare.

Because the EPA's claim to recover response costs seeks an equitable remedy of restitution, it is not covered as damages under the Coakleys' CGL policies. This court in *Desrochers v. Casualty Co.*, 99 N.H. 129, 106 A.2d 196 (1954), established that equitable forms of relief are not covered as damages in CGL policies. A number of courts have cited *Desrochers* for the proposition that equitable actions for injunctive and restitutionary relief are not damages. *See, e.g., Continental Ins. v. Northeastern Pharmaceutical*, 842 F.2d 977, 986 (8th Cir.), *cert. denied*, 488 U.S. 821 (1988); *Maryland Cas. Co. v. Armco, Inc.*, 822 F.2d 1348, 1352 (4th Cir. 1987), *cert. denied*, 484 U.S. 1008 (1988); *Intel Corp. v. Hartford Acc. and Indem. Co.*, 692 F. Supp. 1171, 1188 n.24 (N.D. Cal. 1988); *Ladd Constr. v. Insurance Co. of N. America*, 73 Ill. App. 3d 43, 46–47, 391 N.E.2d 568, 571–72 (1979); *Lido Co. of New England v. Fireman's Fund*, 574 A.2d 299, 300–01 (Me. 1990). Citing *Desrochers*, the Eighth Circuit, sitting en banc, stated that "[b]lack letter insurance law holds that claims for equitable relief are not claims for 'damages' under liability insurance contracts." *Northeastern Pharmaceutical*, 842 F.2d at 986 (quotations omitted); *see also Cincinnati Ins. Co. v. Milliken and Co.*, 857 F.2d 979, 980-81 (4th Cir. 1988) (no coverage for costs of restitutionary relief); *Aetna Casualty and Surety Company v. Hanna*, 224 F.2d 499, 503 (5th Cir. 1955) (no coverage for costs of injunction); *Haines v. St. Paul Fire & Marine Ins. Co.*, 428 F. Supp. 435, 441 (D. Md. 1977) (no coverage for costs of injunctive and restitutionary relief); *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16, 18–19 (Me. 1990) (no coverage for costs of complying with government order to clean up pollution).

To support its position in favor of coverage, the majority misreads *Desrochers* and unnecessarily complicates an already complex issue. The majority uses *Desrochers* for something *Desrochers* was never designed to do. *Desrochers* clearly states what the term "damages" in a CGL policy does not include, namely equitable forms of relief. The majority, however, tries to use *Desrochers* to define what "damages" are, and in the process leaves a thirty-eight-year-old precedent in shambles.

After holding that the cost of compliance with a mandatory injunction is not a sum recoverable "as damages" under a liability insur-

ance policy, *Desrochers*, 99 N.H. at 131, 106 A.2d at 198, the court in *Desrochers* went on to address and find fault with the lower court's reasons for finding insurance coverage. The supreme court rejected the lower court's rationale that the injunction should be treated as a substitute for damages occurring in the future on the technical grounds that the policy in question would no longer be in effect to cover any instances of future damages. *Id.* at 133, 106 A.2d at 199. The majority, today, bases its holding on this substitution argument without even mentioning that it directly contradicts the holding in *Desrochers* that "[t]he cost of compliance with [a] mandatory injunction is not reasonably to be regarded as a sum payable 'as damages.'" *Id.* at 131, 106 A.2d at 198.

The majority tries to justify its position by twisting the reasoning in *Desrochers*. In distinguishing an injunction from traditional tort damages, the court in *Desrochers* listed several, nonexclusive traits of a damages remedy:

> "Damages are recompense for injuries sustained. They are remedial rather than preventive, and in the usual sense are pecuniary in nature. The expense of restoring the plaintiff's property to its former state will not remedy the injury previously done, nor will it be paid to the injured parties."

*Id.* at 131–32, 106 A.2d at 198 (citations omitted). The majority today relies upon this incomplete list of traits and tries to say that response costs must be damages because in some form or another they possess these traits. This approach, though, creates several strained lines of reasoning.

First, the majority creates a distinction between remedial and preventive costs and determines that only remedial expenses are covered as damages. *See supra* p. 412. The creation of this distinction is likely to be the most important aspect of today's decision because it creates an unworkable and illusory distinction that will fuel the fires of future litigation. In this case, it is unclear exactly which response costs incurred by the EPA are remedial and which are preventive. Removing contaminants from the groundwater under the land neighboring the Coakley landfill is certainly remedial, but it is also preventive to the extent that it prevents the contamination from spreading from the groundwater to the ground, plants, animals, and nearby families. Similarly, it is unclear whether decontaminating the groundwater directly under the Coakley landfill is essentially remedial in that it remedies the damage to the groundwater held in trust by the State, or essentially preventive in that it stops the spread of

pollution through the groundwater to neighboring properties, preventing any number of private tort suits.

Perhaps the greatest problem with the majority's treatment of the preventive/remedial distinction is that it creates an irreconcilable contradiction within the opinion. The majority holds that some costs, such as the cost of constructing a containment cap over the site, cannot be damages because they are preventive. This, however, contradicts the substitution argument, gleaned from *Desrochers*, on which the majority's opinion is based. *See supra* p. 412. If the EPA's order to clean up the groundwater is just a substitute for an action for future damages, how can the EPA's order to construct a containment cap be treated any differently? Similar to cleaning up the groundwater, constructing the containment cap will prevent future damages and, under the majority's reasoning, should be treated as a substitute for an action for those future damages. This contradiction exhibits how the majority has misread *Desrochers*.

The majority also reinterprets the court's statements in *Desrochers* that damages "in the usual sense are pecuniary in nature," *Desrochers*, 99 N.H. at 131, 106 A.2d at 198, and are "paid to the injured parties." *Id.* at 132, 106 A.2d at 198. In so doing, the majority uses faulty logic to find a distinction between the direct and indirect payment of costs. Instead of taking the logical steps to work through to its conclusion, the majority starts with its own conclusion and works backwards. Because response costs are damages if they are incurred by the EPA, the majority contends, then it is incongruous for response costs not to be covered if the Coakleys incur them in complying with an EPA injunction. *See supra* pp. 413–14. The majority states that "[i]t should make no difference in terms of insurance coverage whether the engineering firms hired to clean up the polluted groundwater receive their money [directly] from the Coakleys or [indirectly] from the federal or State government. Direct payment is in a 'real sense equivalent' to indirect payment, because either way, the damage to the groundwater is repaired." *Supra* p. 414 (citation omitted).

Under the majority's rationale, response costs are recoverable as damages because they are "pecuniary in nature" as long as some engineering firm is ultimately paid to clean up the groundwater. If this reasoning is carried to its conclusion, the Coakleys' response costs would be covered even if the Coakleys acted on their own, under no EPA injunction, and before the pollution was detected by the government. Such a result is untenable, but it is mandated by the majority's reasoning which disregards what the court in *Desrochers*

meant by the terms "pecuniary in nature" and "paid to the injured parties."

All remedies are "pecuniary in nature" at some level. A party will usually incur costs in complying with an injunction; a party must disgorge funds constituting unjust enrichment in an action for restitution; and a tortfeasor will pay money to compensate a party's injuries in a damages action. The fact that damages are pecuniary in nature only means that the value of an injury is calculated in monetary terms, and money is used to compensate a party for its injury. *See* D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES 135–36 (1973). In contrast to equitable forms of relief, a damages action will not correct the injury itself, nor will any identifiable unjust benefit be returned to the injured party. *See id.* at 135. Rather, the injured party receives a cash award equivalent to the injury sustained. *Id.* The fact that damages are paid to an injured party means only that damages are designed to compensate the injured party's interests. *See id.* at 135–36. How the injured party uses the money award is irrelevant.

The proper logical progression, which the majority should have followed, is as follows. If the Coakleys acted on their own to clean up the hazardous waste pollution they caused, prior to any order by the government, then the costs of their response would not be damages. The money spent would not be compensating any injury and would not be paid to any injured party. They would simply be costs incurred by the Coakleys in the course of conducting their business, costs which are certainly not covered by a CGL policy. If the Coakleys clean up the pollution pursuant to an EPA injunction, the reasoning is the same. The cost of remedying the pollution is still the Coakleys' responsibility, and the fact that the EPA has stepped in on behalf of the public health and welfare does not mean that any party has been injured, nor does it transform the costs of response into some form of compensation for an injury. The response costs are still just a cost of doing business which the Coakleys must bear. Finally, if the EPA steps in, conducts the cleanup, and sues for the reimbursement of its response costs, the money recovered is still not damages. The EPA is not suing for any injuries sustained by the natural resources of the United States; the money paid is not compensation for natural resource damage; and the money paid is not the value of any damages, but rather is the value of the unjust benefit conferred upon the Coakleys by the EPA when the EPA assumed the Coakleys' responsibilities and cleaned up the pollution, saving the Coakleys the cost thereof.

To hold otherwise, as the majority does, creates an unintended anomoly. It must be agreed that the Coakleys would not be covered for their costs of response if they acted on their own, prior to any government involvement, to clean up the pollution they caused. The majority's decision today, though, finds coverage for response costs as damages as long as the Coakleys wait long enough for the EPA to enter the picture to issue an order, obtain an injunction, or conduct the cleanup itself. Such an approach by the majority makes insurance coverage contingent on the mere fortuity of government involvement in the cleanup process and will discourage polluters and responsible parties from taking any initiative to remedy the pollution they have caused. Indeed, under the majority's reasoning, companies and industries will have no incentive to adhere to government safety standards or environmental regulations. If a company neglects its duties and forces a government agency to demand compliance, instead of complying with these directives and absorbing the cost as a cost of doing business, then all of these business expenses would now be covered by insurance. For example, if a government agency ordered all apartment complexes to be equipped with smoke detectors, the owners of such complexes would have to install detectors and bear the cost. If one owner refused to install the detectors, forcing the agency to order compliance or install them itself, the costs would now presumably be covered by a CGL policy by virtue of the government agency's involvement.

Finally, in dissent, I must object to the majority's unwarranted resort to dictionary definitions in order to find the term "damages" to include response costs. We have declared that this court will not find a clause to be ambiguous just so that we may resolve the contrived ambiguity against an insurer. *Laconia Rod & Gun Club v. Hartford Acc. & Indemn. Co.*, 123 N.H. 179, 182–83, 459 A.2d 249, 251 (1983). Specifically, I object to the majority's use of dictionary definitions for two reasons. First, a dictionary by its very design has several varied definitions for a single word. It is not appropriate for the court to search the dictionary for the one definition that will result in coverage in a particular case.

Second, the majority's actual use of the dictionary definitions in its opinion is misleading. The majority concludes that response costs fit the definition of damages stating them to be "compensation or satisfaction imposed by law for a legal injury." *Supra* p. 415. The full text of this part of the definition is stated earlier in the majority's opinion and reads: "compensation or satisfaction imposed by law for a wrong or injury *caused by a violation of a legal right.*" WEBSTER'S THIRD

NEW INTERNATIONAL DICTIONARY 571 (unabridged ed. 1961) (emphasis added). The majority fails to address the fact that response costs do not fit this definition unless they are to compensate an injury "caused by a violation of a legal right." In this case, the EPA has suffered no violation of a legal right. It has no right not to incur response costs. Indeed it has an affirmative duty to remedy hazardous waste pollution. The pollution caused by the Coakleys may have violated the rights of private parties not to have their land polluted, or even the rights of the State of New Hampshire not to have its groundwater contaminated. But the recovery of response costs by the EPA is in no way compensation for these injuries.

The majority undoubtedly will object to this dissent on the ground that the denial of coverage relies upon the imposition of a technical legal term, distinguishing an action in equity from an action for damages, upon the plain meaning of the insurance policy. Such an objection is misplaced for two reasons. First, even the majority recognizes that a term in an insurance policy cannot be considered ambiguous if it has already been defined by judicial decision. *Supra* pp. 409–10; *see* 13 J. APPLEMAN & J. APPLEMAN, INSURANCE LAW AND PRACTICE § 7404, at 339 (1976). *Desrochers* clearly holds that equitable forms of relief are not recoverable as damages under the terms of a general liability policy. *Desrochers*, 99 N.H. at 131–32, 106 A.2d at 198. With this precedent in place in New Hampshire, the term "damages" cannot be deemed ambiguous, nor can any insurance carrier have been expected to modify the wording of its policy in search of a clearer statement of coverage.

Second, even without relying on a judicial decision to define damages, the average insured would understand that response costs would not be covered as damages under the terms of a CGL policy. I agree with the majority that an insured may not know the technical legal distinctions between actions in law and actions in equity, but this is not what the average insured must understand to know that response costs are not covered. The insured must know only that the CGL policy covers only those costs "which the insured shall become legally obligated to pay as damages." Any insured knows that general liability insurance does not cover all costs which a company might incur in the course of doing business. It does not cover operating costs, penal sanctions, or the cost of complying with the directives of a regulatory agency. No reasonable insured could believe that insurance coverage could be created by failing to comply with an agency's directives or failing to heed its orders.

Because I would hold that response costs cannot be considered damages under the CGL policies, I would also hold that Maine Bonding and St. Paul have no duty to defend the Coakleys against the actions of the EPA and NHDES. For the reasons set forth above, I respectfully dissent.

THAYER, J., joins in the dissent.