Belknap
No. 91-425

M. MOONEY CORP.

v.

UNITED STATES FIDELITY & GUARANTY COMPANY

December 3, 1992

464

*Wescott, Millham & Dyer*, of Laconia (*Peter V. Millham* on the brief and orally), for the plaintiff.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Eileen Fox* on the brief and orally), for the defendant.

JOHNSON, J.   The defendant, United States Fidelity & Guaranty Company (USF&G) appeals from an order of the Superior Court (*McHugh*, J.) in a declaratory judgment action. The court found coverage for the plaintiff, M. Mooney Corp. (Mooney), under insurance policies issued by USF&G for claims relating to defective work performed by Mooney's subcontractors. We affirm.

Mooney is a general contractor engaged in major construction projects throughout the State. For each year relevant to this appeal, Mooney held a USF&G comprehensive general liability insurance policy and paid a premium for broad form property damage and completed operations coverage.

In 1983, Mooney entered into a contract with MARA Development Corp. to construct the 52-unit Ram's Horn Condominium project at Loon Mountain. Mooney hired subcontractors for aspects of the project, including roofing work and fireplace and chimney masonry. The project was completed in 1986, and all units were sold to individual owners. Thereafter, unit owners began to identify defects in the project.

In the spring of 1988 a chimney fire damaged one unit. Investigators attributed the fire to inadequate clearance between the fireplace masonry and wood framing, and further inspections revealed charring adjacent to fireplaces in four other units. Although no evidence of fire or charring appeared in any of the forty-seven remaining units, the State fire marshal prohibited use of fireplaces in all units pending correction of the hazard.

In October 1988, Ram's Horn on Loon Mountain Condominium Association (Ram's Horn) sued Mooney. Mooney sought coverage

under its USF&G policy for three of Ram's Horn's claims: 1) that defective construction of fireplaces and chimneys resulted in the fire marshal's order closing all fireplaces; 2) that defective roofs caused water damage to interior areas; and 3) that unit owners consequently suffered loss of use of their property. Ram's Horn alleged damages for the value of lost use of their property and for the cost of repairs.

Mooney incurred great expense in reconstructing chimneys to the fire marshal's satisfaction and in repairing structures damaged by leaking roofs. USF&G paid Mooney for repairing actual damage in the five burned and charred units, but denied coverage for claims based on defective masonry and roofing work and based on the loss of use and repairs of fireplaces in the forty-seven units that were not burned or charred. USF&G maintained that there had been no "occurrence" to trigger its duty to defend or pay Mooney for loss of use and repairs in the forty-seven unburned units, and that policy exclusion (3) and exclusion (p) are further grounds for denying coverage. Following a bench trial, the trial court determined that the chimney fire was an "occurrence" and that no exclusions applied. The trial court directed USF&G to cover claims for damages attributable to lost use and the cost of repairs associated with the roof leaks and the owners' inability to use fireplaces.

On appeal, USF&G raises four arguments for reversing the trial court. USF&G first argues that claims for repairs and loss of use of fireplaces in the forty-seven unburned units do not allege "property damage" caused by an "occurrence." Second, USF&G contends that exclusion (p) precludes coverage for claims arising from the fire marshal's "withdrawal" of defective fireplaces. Third, USF&G argues that exclusion (3) bars coverage for the fire and water damage that resulted from the subcontractors' shoddy masonry and roofing work because Mooney accepted that work when it deemed the project complete. Finally, USF&G objects to the trial court's consideration of testimony of Mooney's independent insurance agent in finding exclusion (3) inapplicable. Examining the fine print of Mooney's policy, recognizing that the insurer bears the burden under RSA 491:22-a of establishing no coverage, *Laconia Rod & Gun Club v. Hartford Acc. & Indemn. Co.*, 123 N.H. 179, 182, 459 A.2d 249, 250 (1983), and resolving ambiguities in favor of the insured, we affirm.

*I. "Property Damage" and "Occurrence"*

In a simple declaratory sentence followed by pages of conditions and exclusions, USF&G agreed to pay "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . caused by an occurrence" and promised to defend its insured in any suit "seeking damages on account of such . . . property damage." The terms "property damage" and "occurrence" are defined on the policy jacket as follows:

"'[P]roperty damage' means:

. . .

*loss of use of tangible property* which has not been physically injured or destroyed provided such loss of use is *caused by an occurrence* during the policy period.

"'[O]ccurrence' *means an accident,* including continuous or repeated exposure to conditions, *which results in . . . property damage* neither expected nor intended from the standpoint of the insured."

(Emphasis added.) Mooney contends that it is covered for claims for damages relating to the forty-seven fireplaces closed by the fire marshal after the fire, since unit owners lost use of property even though the units were not physically injured. USF&G argues that loss of use of the uninjured fireplaces was not caused by an "occurrence," because none of the forty-seven units suffered physical damage and nothing resembling an "occurrence" is alleged in Ram's Horn's pleadings.

As a preliminary matter, we note that the question we address here is different from that addressed in *Coakley v. Maine Bonding & Cas. Co.,* 136 N.H. 402, 618 A.2d 777 (1992). In *Coakley,* we refined the definition of "damages" compensable under a general liability policy to "include only those costs which are remedial, not preventive." *Id.* at 416, 618 A.2d at 785–86. We relied on this distinction to hold that the term "damages" includes the cost of cleaning up existing damage to groundwater beneath a landfill, but not the cost of investigating and implementing a plan to prevent further migration of contaminants into the groundwater. *Id.* at 416, 618 A.2d at 785.

The parties do not contend, and we find no reason to conclude, that Ram's Horn's claims for lost use and repairs seek anything but remedial compensation for diminished property value resulting from leaky roofs and unusable fireplaces. For example, a measure of dam-

ages for a leaking roof could be the cost of repairing the roof. *See id.* at 412, 618 A.2d at 783 (citing *Moulton v. Groveton Papers Co.,* 114 N.H. 505, 513, 323 A.2d 906, 911 (1974)). This is not to say that implementing remedial measures could not incidentally prevent future harm in this case. Similarly, if the unit owners' inability to use their fireplaces constituted "property damage" under the policy, then a trial court could reasonably find that possible measures of the resulting harm include the value of lost use and enjoyment and the cost of restoring fireplaces to working order. The fire marshal prohibited further use of the fireplaces until satisfactory repairs were made. The cost of repairs to remedy an otherwise permanent loss of fireplaces would not be a preventive expenditure, because it would fund restoration of "property damage" (defined as "loss of use" under the policy), rather than prevention of future harm.

We turn to whether the loss of use of fireplaces constituted "property damage" caused by an "occurrence." That the fire and charring in five units gave rise to certain covered claims is undisputed in this case; USF&G apparently conceded this point, for it paid for repairs to these five units. Applying the policy language to these facts, we consider whether the fire that caused physical damage to one unit also caused the loss of use of fireplaces in the remaining units.

The fire that damaged one unit of the Ram's Horn complex sparked an investigation which revealed hazardous conditions in all units. Pursuant to his duties under RSA chapter 153, the fire marshal prohibited further use of fireplaces in all units. Under these facts, there is a clear causal link between the occurrence of the fire and the fire marshal's order that resulted in the loss of use of tangible property in all units.

We address an issue embedded in USF&G's first argument before we draw this analysis to its natural conclusion and find "property damage" caused by an "occurrence" in the fireplace claims. USF&G never directly disputes that the fire that burned one unit constituted an "accident . . . which result[ed] in . . . property damage," but asserts instead that the facts pleaded by Ram's Horn do not allege loss of use caused by an occurrence. Ram's Horn's writ charged that improper design and construction of the fireplaces resulted in the fire marshal's issuance of an order closing the fireplaces, and that this caused damages including the cost of repairs and loss of use of property. Nowhere in Ram's Horn's writ is the occurrence of the fire alleged. USF&G presumes that it must confront only the facts actually

in the pleadings and accordingly argues that there is no coverage for claims alleging defective work.

The terms of Mooney's policy do not sustain USF&G's argument that coverage must arise only from alleged facts rather than from underlying facts. The insurer pledged in broad terms to defend any suit "seeking damages on account of . . . property damage, even if any of the allegations of the suit are groundless." The policy does not expressly restrict this duty to cases in which the pleadings alone allege sufficient facts to constitute covered claims.

■ Instead, USF&G relies on "well-settled" law that an insurer's duty to defend may be determined by whether the facts pleaded in the cause of action against the insured fall within the express terms of the policy. *U.S. Fidelity & Guaranty Co., Inc. v. Johnson Shoes, Inc.*, 123 N.H. 148, 151–52, 461 A.2d 85, 87 (1983); 7C J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4683 (W. Berdal ed., 1979 & Supp. 1991). However, this well-settled law permits, but does not require, an insurer and ultimately this court to find a duty to defend solely on facts in the writ. When the alleged facts do not clearly preclude an insurer's liability, inquiry may proceed into underlying facts. *See, e.g., Happy House Amusement, Inc. v. N.H. Ins. Co.*, 135 N.H. 719, 722–23, 609 A.2d. 1231, 1232–33 (1992); *Moore v. N.H. Ins. Co.*, 122 N.H. 328, 331-33, 444 A.2d 543, 545–46 (1982); *Allstate Ins. Co. v. Carr*, 119 N.H. 851, 853, 409 A.2d 782, 783–84 (1979); 7C APPLEMAN *supra*. An analysis into facts underlying the writ is necessary in such circumstances to avoid permitting the pleading strategies, whims, and vagaries of third party claimants to control the rights of parties to an insurance contract. *See* R. KEETON & A. WIDISS, INSURANCE LAW: A GUIDE TO FUNDAMENTAL PRINCIPLES, LEGAL DOCTRINES, AND COMMERCIAL PRACTICES § 9.3 (practitioner's ed., 1988); 1A R. LONG, THE LAW OF LIABILITY INSURANCE § 5.02 (1990).

■ The facts in Ram's Horn's writ do not clearly preclude coverage. A fire marshal's duties include investigating the cause of fires and issuing abatement orders. RSA 153:4-a, I(f), :14, II. Insurance investigators reading Ram's Horn's claims that hearths were defective and that the fire marshal issued a condemnation order could reasonably infer that a fire may have triggered the fire marshal's response.

■ Therefore, we look beyond the facts alleged in Ram's Horn's writ to find an "occurrence" in the fire that damaged one unit during

the policy period, and we need not consider whether defective work alone constitutes property damage or an occurrence. The loss of use of fireplaces in all units falls within the definition of "property damage" and was a direct result of the fire that provoked the fire marshal's inspection and condemnation order. Thus, claims for damages arising from the loss of use of fireplaces in any of the units are claims seeking damages for "property damage" caused by an "occurrence" under the policy.

*II. Exclusion (p)*

We next consider whether exclusion (p) bars coverage for the fireplace claims. Under exclusion (p), the policy does not insure against

> "*damages claimed for* the withdrawal, inspection, repair, replacement, or loss of use of the Named Insured's products or *work completed by or for the Named Insured* or of any property of which such products or work form a part, *if such products, work or property are withdrawn from the market or from use because of any known or suspected defect* or deficiency therein."

(Emphasis added.) Mooney contends that the clause excludes only those claims that arise when the *insured* withdraws work or property. In the absence of any indication who the actor might be whose act of "withdraw[ing]" would preclude coverage, USF&G asks us to find that the fire marshal's condemnation order gave rise to claims excluded from coverage.

The interpretation of exclusions in an insurance policy is ultimately an issue for this court. *See State Farm Mut. Auto. Ins. Co. v. Cookinham*, 135 N.H. 247, 249, 604 A.2d 563, 564 (1992). The method of interpretation that we employ is first to determine whether the language in question is ambiguous. *Id.* We find an exclusionary clause ambiguous if "reasonable disagreement between the contracting parties is possible." *Smith v. Liberty Mut. Ins. Co.*, 130 N.H. 117, 122, 536 A.2d 164, 166 (1987). If we find no ambiguity, we interpret the policy "'as would a reasonable person in the position of the insured based on a more than casual reading of the policy as a whole.'" *Cookinham*, 135 N.H. at 249, 604 A.2d at 564 (quoting *Haley v. Allstate Ins. Co.*, 129 N.H. 512, 514, 529 A.2d 394, 396 (1987)). However, if we find a clause ambiguous and there is no evidence that "prior dealings between the contracting parties indicate their intent to provide no coverage," we will interpret the clause in

favor of the insured and against the insurer. *Smith*, 130 N.H. at 123–24, 536 A.2d at 167–68.

Following these rules of construction, we first determine the reasonableness of each party's interpretation of the disputed clause by looking at the claimed ambiguity in context and by construing words "according to their plain, ordinary, and popular definitions." *Robbins Auto Parts, Inc. v. Granite State Ins. Co.*, 121 N.H. 760, 764, 435 A.2d 507, 509–10 (1981). In this case, the claimed ambiguity lies in the absence of an actor in the phrase "if such products, work or property are withdrawn from the market or from use." It cannot be said with certainty whose act of withdrawal excludes coverage because the policy drafters dodged the issue by using a passive construction.

We are satisfied that USF&G's broad reading of exclusion (p) is reasonable. In eschewing precise language, the drafters opened the clause to expansive interpretations such as that which USF&G posits.

Mooney's narrower reading of the exclusion's language requires further scrutiny to determine if it is also reasonable. In this case, the term "withdraw" is significant. A common definition of "withdraw" is "to take back or away (something bestowed or possessed)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2626 (unabridged ed. 1961). This definition implies that the party who provided the work also withdrew it. Mooney and its subcontractors built fireplaces for the unit owners, but it was the fire marshal who prohibited further use. It is a stretch of this definition to find "withdraw[al]" in the fire marshal's order forbidding use of fireplaces. Thus, Mooney's argument that the exclusion only applies when the insured withdraws the work appears reasonable. *See Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wash. 2d 37, 42–50, 811 P.2d 673, 676–79 (1991).

Further support for our finding Mooney's interpretation of the exclusion reasonable lies in an appreciation of the context in which Mooney purchased coverage. Mooney is a general contractor involved in large, multi-unit construction projects. A design or construction defect perpetrated by a subcontractor in a multi-unit project may result in damages arising from a third party's condemnation of an aspect of the project. Especially because exclusion (p) is silent regarding whose act of "withdraw[ing]" work will preclude coverage, a reasonable general contractor reading all the provisions of its contract could expect that a comprehensive general liability

policy with broad form property damage and completed operations coverage insures against this grave risk, even if it does not cover claims arising from the contractor's own withdrawal of defective work. *Cf. Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361, 357 N.Y.S.2d 705, 708, 314 N.E.2d 37, 39 (1974) (holding exclusions inapplicable to claims arising from third party's withdrawal of insured's contaminated food, in part because of "economic and factual setting" in which food manufacturer purchased multi-peril liability insurance).

In light of the parties' reasonable and contradictory interpretations of the clause, we find exclusion (p) ambiguous. Because there is no extrinsic evidence that the policy would not cover claims such as those arising from the fire marshal's order, we hold in favor of the insured that exclusion (p) does not apply. *Smith*, 130 N.H. at 123–24, 536 A.2d at 167–68; *Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 771, 423 A.2d 980, 985 (1980).

*III. Exclusion (3)*

We next consider whether exclusion (3) in the broad form property damage endorsement bars coverage for claims arising out of defective work performed by Mooney's subcontractors. Exclusion (3) states that the policy does not apply

> "with respect to the completed operations hazard and with respect to any classification stated in the policy or in the company's manual as 'including completed operations', *to property damage to work performed by the named insured arising out of such work* or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith."

(Emphasis added.)

At issue is the meaning of "work performed by the named insured." Mooney contends that the phrase means precisely what it states: claims arising from *its own* work as the "named insured" are excluded from coverage, but claims arising from a subcontractor's defective work remain covered by the broad form endorsement. USF&G argues that the exclusion bars coverage for claims arising from any work completed under Mooney's contract with the developer, whether or not subcontractors rather than the "named insured" actually performed the work.

We adhere to the method of construing disputed provisions that we outlined above. We first analyze the clause to identify terms over

which the contracting parties may reasonably disagree, and we generally resolve ambiguities to find coverage. *Cookinham,* 135 N.H. at 249, 604 A.2d at 564. If there are no ambiguities, we interpret the policy as "would a reasonable person in the position of the insured based on a more than casual reading of the policy as a whole." *Id.* (quotation omitted).

Mooney's literal interpretation of "work performed by the named insured" is eminently reasonable. It comports with "plain, ordinary, and popular definitions" of the words in context, *Robbins Auto Parts, Inc.,* 121 N.H. at 764, 435 A.2d at 509–10, and offers a cogent explanation for exclusion (3)'s role in the broad form. *See Maryland Cas. Co. v. Reeder,* 270 Cal. Rptr. 719, 726 (Ct. App. 1990). For an extra premium, Mooney purchased the expanded coverage afforded by the broad form endorsement. The broad form affects coverage by adding to, deleting, or modifying provisions in the basic policy. Exclusion (3) on the broad form replaces similar language contained in the basic policy, but notably omits the words "or on behalf of" from the phrase "work performed by *or on behalf of* the named insured." (Emphasis added.) These textual changes form a sound basis for Mooney's argument that the omitted terms limit the scope of exclusion (3) and permit coverage for claims arising from a subcontractor's defective work.

USF&G contends that the broad form's omission of the phrase "or on behalf of" does not affect the exclusion's applicability to subcontractors' work. USF&G argues that "work performed by the named insured," when read in context, excludes coverage for all work that a "named insured" contractor turns over to a developer under its general contract, including any work performed by subcontractors. Exclusion (3)'s express statement that it applies "with respect to . . . completed operations" is significant, according to USF&G, because any work performed by subcontractors merges into the final product of the general contractor once the project is complete.

We have found Mooney's interpretation eminently reasonable and amply supported. Whether or not we find USF&G's explanation reasonable, we hold that exclusion (3) is at best ambiguous. Because there is no evidence of prior dealings in which the parties agreed there should not be coverage, we find for the insured. *See Smith,* 130 N.H. at 123–24, 536 A.2d at 167–68.

Policy interpretation is ultimately a question of law for this court, *Cookinham,* 135 N.H. at 249, 604 A.2d at 564, and we have decided

this case without reference to any disputed evidence. For this reason, we need not address USF&G's argument that the trial court improperly considered certain testimony of Mooney's insurance agent.

■■■ For the foregoing reasons, we affirm the superior court's order finding coverage under insurance polices issued by USF&G for all claims involved in this action that arise from defective work performed by Mooney's subcontractors.

*Affirmed.*

BROCK, C.J., with whom THAYER, J., joined, dissented; the others concurred.

BROCK, C.J., dissenting: Because the majority has engaged in what may be characterized as nothing less than verbal gymnastics in order to find coverage under the insurance provisions at issue in this case, I respectfully dissent.

The majority's reasoning that a "clear causal link" between the occurrence of a fire in one condominium unit and the fire marshal's order prohibiting use of the remaining units' fireplaces thereby established an "accident" resulting in "property damage," presents a strained application of the policy's terms. The policy does not cover an occurrence of alleged negligent construction; it covers negligent construction that results in an occurrence. Merely because the remaining units were found to contain allegedly negligent construction and their use was consequently withdrawn from the market does not mean there has been an "accident" within the meaning of the policy.

In addition, I cannot approve of the majority's construction of exclusion (p) as ambiguous. Exclusion (p) excludes from coverage costs incurred by the withdrawal of work completed from the market. There are no words of limitation concerning the identity of the party who might withdraw the work completed from the market. Thus, under the plain language of the exclusion, it is immaterial that the withdrawal was not by the insured.

Finally, I consider the analysis given by the majority as to the effect of exclusion (3) unsatisfactory as important considerations of construction risks and principles of insurance have simply been ignored.

I would reverse the decision of the trial court and deny coverage under the insurance policies issued.

THAYER, J., joins in the dissent.