Peterborough v. Hartford Fire Ins.   CV-92-50-SD   04/07/97

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Town of Peterborough

    v.                                      Civil No. 92-50-SD

The Hartford Fire
 Insurance Company,
 its affiliates;
ITT Hartford Insurance Group


O R D E R


In this declaratory judgment action, the Town of Peterborough seeks coverage under a comprehensive general liability (CGL) insurance policy for the various costs relating to the investigation and cleanup of groundwater and surface water contamination caused by hazardous wastes located at the former town dump.

Before the court is a motion for summary judgment filed by Hartford Fire Insurance Company, its affiliates, and ITT Hartford Insurance Group (collectively, Hartford), to which plaintiff objects.[1]  Hartford argues that plaintiff is not entitled to indemnification under the CGL policy because (1) the town did not sustain "damages" within the meaning of the CGL policy and (2) the damages the town did sustain did not result from an

---

[1]The court has also reviewed Hartford's reply memorandum.

"occurrence" as defined by the policy.  For the reasons that follow, the court finds and rules that genuine issues of material fact exist on both questions; therefore, Hartford's motion is denied.

## Background

In 1986 the owners of a large parcel of land ("the northern parcel") located in Peterborough, New Hampshire, made the unhappy discovery that their land, surface water, and groundwater were heavily contaminated with hazardous volatile organic compounds (VOCs) and dense non-aqueous phase liquids (DNPLs).  The source of the contamination turned out to be the south-side adjacent parcel of land that had been used as the town burning dump from 1948 to 1970 ("the dump site").  During that period, various wastes, including liquid industrial solvents, were disposed of at the site until 1970, when the dump was closed down and capped with permeable soil.

Soon after the discovery of the contamination at the northern parcel in the mid-1980s, the owner of the dump site, Eastern Mountain Sports (EMS),[2] contacted ENSR Consulting and Engineering Company to investigate the contamination on both

_____

[2]EMS acquired a portion of the site in 1980 from a previous owner.

properties and evaluate remedial alternatives.  With approval from the New Hampshire Department of Environmental Services (NHDES), ENSR then launched into a detailed study of both the dump site and the northern parcel with the purpose of determining "the most appropriate remedial action for design and implementation."  ENSR Report, October 1991, at 1-1.

ENSR submitted a final report to NHDES in October of 1991. In its report, ENSR considered several options, including installing pump wells to capture groundwater within the till deposits, but ruled out such options for various technical reasons.  Recognizing the limitations of other means of remediation, ENSR made a multi-part proposal.  First, it suggested recapping the landfill with a multi-level coverage system in order to reduce infiltration of precipitation into the landfill and to reduce the leaching and migration of contaminants from the landfill materials.  ENSR Report at 1-11.  It also proposed that the northern parcel be purchased so that "control over access and development would be maintained" and that a groundwater management zone (GMZ) be established.  Id.  Finally, ENSR recommended that a long-term groundwater and surface water monitoring program be established at both sites.  In making this recommendation, ENSR noted that contaminant migration appeared to be "generally contained" within the site boundaries, but that the

3

proposed monitoring program was necessary to assess changes in conditions over time. Id. at 1-12. NHDES approved ENSR's proposals, with some modifications.

For reasons that will be developed infra, the core of the current dispute between the parties is whether the multi-level cap proposed by ENSR would function primarily as a "remedial" measure, to help clean up the contamination, or whether it instead would function as a "preventive" measure, designed to contain the contamination and prevent its spread.

In 1991 Peterborough hired Aries Engineering, Inc., to assist in developing a site closure plan for the site that would be consistent with ENSR's recommendations and the NHDES's letter approving ENSR's final report. In addition, the site closure plan was to be consistent with the complex regulations promulgated by NHDES relative to landfill closures. Aries conducted a limited groundwater assessment to determine the appropriate boundaries of the GMZ and conducted a hydrogeologic study of the site to determine the direction and limits of the contamination plume. In 1993 Peterborough purchased the northern parcel adjacent to the site, in part because the owners of the property had threatened to sue Peterborough for the contamination of their property. Another reason behind the purchase was to give Peterborough the ability to control the entire area

4

comprising the GMZ.

Meanwhile, the lawsuit that triggered the instant action had begun. In 1990 EMS sued New Hampshire Ball Bearings (NHBB) in this Court (Loughlin, J.), seeking to recover environmental response costs related to the site and other relief. NHBB was alleged to be responsible for depositing a vast amount of hazardous chemicals at the site. In November 1994 Peterborough, NHBB, and EMS entered into a Consent Agreement, which was approved by Judge Loughlin. Under the Agreement, Peterborough agreed to pay a 39 percent share of the costs relating to the response action at the site and related investigation costs. Peterborough also agreed to perform future activities that included groundwater and surface water monitoring, cap maintenance, and site inspections. At the time, the total response costs were estimated to be $2,500,000, with Peterborough's responsibility totaling $975,000.

In the present action, filed in 1992, Peterborough seeks coverage under several CGL policies issued by Hartford for Peterborough's share of the responsibility for the response action. In a previous order, this court entered judgment in Hartford's favor with respect to all of the policies except Policies Nos. 08SMP 905678 and 08 SMP 100151. See Order of June 9, 1993, (Devine, J.). Both of these remaining policies provide

5

standard CGL coverage for property damage caused by an occurrence.

Since the initiation of this lawsuit, certain other developments have occurred. In January of 1995, Aries submitted a Landfill Closure Design to NHDES on behalf of Peterborough; the Design was subsequently approved, with some modifications, in May of 1996. Under the Design, the proposed remedy for the site consists of covering the landfill with a synthetic cap, along with several other layers of material. In addition, the Design requires the town to take certain other measures to close the site, including erosion and sedimentation control measures, preliminary site development, stormwater management, and post-closure monitoring.

## Discussion

## 1. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c), Fed. R. Civ. P.; Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996). Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial.'" Stone & Michaud Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

When the non-moving party bears the burden of persuasion at trial, to avoid summary judgment he must make a "showing sufficient to establish the existence of [the] element[s] essential to [his] case." Celotex Corp. v. Catrett,, 477 U.S. 317, 322-23 (1986). It is not sufficient to "'rest upon mere allegation[s] or denials of his pleading.'" LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson, supra, 477 U.S. at 256), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the non-moving party." Id. at 842 (citations omitted).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the non-moving party's favor. Anderson, supra, 477 U.S. at 255. Nevertheless, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st

7

Cir. 1990) (citations omitted).

2. The Merits

Plaintiff Peterborough seeks coverage under the CGL policies for costs resulting from the contamination at the former dump site, including the costs of constructing the landfill cap, all related systems, and all related investigation costs. The CGL policies provide coverage to the town with respect to "all sums which [it] shall become legally obligated to pay as damages because of bodily injury or property damage . . . caused by an occurrence." See Policies Nos. 08 SMP 905678 and 08 SMP 100151 (attached to defendant's motion for summary judgment). The parties' first dispute focuses on whether the interpretation of "damages" could extend to the various response actions taken, or planned to be taken, by Peterborough.

Both sides rely on Coakley v. Maine Bonding & Cas. Co., 136 N.H. 402, 419, 618 A.2d 777, 787-88 (1992), which held that remedial response costs imposed by the Environmental Protection Agency (EPA) and by NHDES, including the costs of complying with a cleanup injunction and reimbursing EPA for related investigatory costs, are "damages" within the meaning of CGL policies. In contrast, the court held that predominantly preventive measures and related investigatory costs would not qualify as "damages." Id. at 411, 618 A.2d at 782-83. In

8

drawing this distinction, the court observed that "the cost of cleaning up the contamination, including related investigatory costs, <u>is directly related</u> 'to the amount of damages which might result' to the groundwater if the groundwater is not cleaned up." <u>Id.</u> at 412, 618 A.2d at 783 (quoting <u>Desrochers v. Casualty Co.</u>, 99 N.H. 129, 133, 106 A.2d 196, 199 (1954)) (emphasis added). The court further reasoned that when damage has already been done to a particular area, the costs of cleaning it up would likely be the same as the amount of "damages." <u>Id.</u> However, the costs of preventive measures would not correlate as closely to the amount of "damages" incurred. Therefore, "containment costs, including related investigatory costs, do not fit the definition because they are not compensation or satisfaction imposed by law for *a wrong or injury* caused by a violation of a legal right." <u>Id.</u> at 416, 618 A.2d at 785 (quotation omitted).

In <u>Coakley</u>, the court was faced with the issue of whether environmental response costs imposed by or likely to be imposed by EPA and NHDES pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, <u>et seq.</u> (CERCLA) and comparable state statutes would qualify as "damages" under CGL policies. There, a landfill containing hazardous waste had to be closed when NHDES discovered that groundwater and wells in neighboring areas were contaminated.

9

Applying the remedial/preventive distinction outlined above, the court held that the cost of cleaning up the contaminated groundwater was remedial rather than preventive, as was reimbursement of EPA's investigatory costs related to the cleanup. Id. at 411, 618 A.2d at 782-83. The court also found that it appeared that a containment cap proposed for the landfill was a "predominantly preventive measure," as were the related investigatory costs. Id. Although the court left the ultimate decision of what constitutes "damages" to the superior court to be resolved in the first instance, id. at 419, 618 A.2d at 787-88, it did note that the hazardous waste sought to be contained in the landfill had not yet injured the groundwater, and therefore the containment plan was essentially "preventive," id. at 416, 618 A.2d at 785.

Following Coakley, this court's task is to apply the remedial/preventive distinction to the facts in the case at bar. The response costs for the former town dump site recommended in the Landfill Closure Design and associated investigatory costs can be divided into four categories: (1) the costs of constructing a new landfill cap and related costs and the costs related to establishing a groundwater management zone (GMZ); (2) the costs associated with the post-closure monitoring plan; and (3) the amount paid by Peterborough to purchase the northern

10

parcel.

Seizing on the apparent similarities between the facts of this case and those of <u>Coakley</u>, Hartford argues that the costs related to the construction of a new landfill cap are essentially preventive in nature and therefore not covered as "damages" under the CGL policies. The basic fact that the cap is intended to keep in or contain contaminants in the landfill is very strong evidence that it serves a predominantly preventive function. However, Peterborough has submitted evidence sufficient to create a genuine issue of material fact as to whether, in this case, aside from its preventive function, the cap aided in the cleanup of the groundwater and surface water <u>already</u> contaminated by the migration of substances from the dump.

The record reveals that ENSR, the environmental consulting firm hired to investigate and propose a response plan, considered several options for cleaning up the contaminated groundwater and surface water at the dump site and the adjacent northern property. For various technical reasons, ENSR determined that more active cleanup mechanisms such as pumping and treating the water or installing a trench to extract shallow groundwater for treatment were not feasible or practical. <u>See</u> Affidavit of Peter J. McGlew at ¶¶ 33-35 (attached to Peterborough's objection). For example, one factor cited by ENSR was worker safety. ENSR

11

Report at 3-16.  Instead, ENSR proposed and NHDES approved a multi-layer low permeability cap at the site in order to eliminate existing leachate seeps and to clean up the surface water contamination.  See McGlew Affidavit at ¶ 25.[3]  It appears that the "prevention" of such seepage also would have the remedial effect of aiding the process of natural attenuation of the groundwater and surface water.  Natural attenuation refers to processes such as biodegradation, dispersion, and dilution.  Once the dissolved DNPLs reach the Contoocook River near the site, the DNPLs are further degraded by such natural processes as aeration, volatilization, and photolysis.  Id. at ¶ 39.  Furthermore,

> Aries, ENSR and NHDES agreed that a more passive remedial action such as capping the landfill and establishing a GMZ for the attenuation of DNAPL constituents was appropriate here, especially in light of the potential adverse impacts to the environment and the infeasibility of implementing a Site ground water pump and treat remediation plan.

Id. at ¶ 41.  Apparently, the cap would create conditions that would facilitate the natural degradation of the contamination.

It follows that the landfill cap may have had both preventive and remedial functions.  See, e.g., M. Mooney Corp. v. USF&G, 136 N.H. 463, 467-68, 618 A.2d 793, 796 (1992)

_____

[3]The cap would function, in part, by preventing the infiltration of precipitation into the landfill, thereby reducing the leaching of the contaminants from the soil.  ENSR Report at 1-11.

12

(recognizing that implementing remedial measures may, at times, incidentally prevent future harm). While capping the landfill would serve to prevent the spread of contamination, it also appears that the cap may have had the primary purpose of aiding in the cleanup of the contaminated groundwater and surface water at the site and at the adjoining northern property. Thus, the trier of fact should decide whether the cap, including all of the costs associated with its construction, is covered by CGL policies.[4]

The court's decision to leave the "preventive vs. remedial" determination to the jury in this instance is also supported by policy concerns. The record reveals that ENSR recommended the cap to aid in the cleanup of a nearby groundwater and surface water after carefully investigating several other remedial options. It ruled out these alternatives primarily because of considerations of feasibility, practicality, cost effectiveness, and worker safety. If a court were to decide that landfill caps were always "preventive" and therefore not covered by the standard CGL policy as a matter of law, Peterborough would be

_____

[4]The court's decision applies as well to the "related closure systems" at the dump site, mentioned by Hartford in its motion at page 9. These measures include the stormwater management system designed to remove surface water over the cap, and erosion and sedimentation control measures used in preparation for the installation of the cap.

13

discouraged from choosing the most feasible, practical, and safe means of cleanup.

Hartford also argues that the groundwater management zone and the post-closure monitoring plan are essentially preventive in nature and therefore not covered by the CGL policies. ENSR recommended the GMZ in order to "regulate the use of contaminated groundwater following initial remediation actions such as source control." ENSR Report at 3-17. Under the plan, the groundwater and surface water within the GMZ would be monitored for the presence of VOCs. Id. Having reviewed the evidence, the court finds that a genuine issue of fact exists as to whether the GMZ and the post-closure monitoring plans have the remedial function of aiding in the cleanup of the groundwater and surface water, rather than of simply ensuring that further contamination of these areas would be prevented.

Similarly, a genuine issue of material fact exists as to whether the purchase of the northern parcel was related to the cleanup of the contaminated groundwater and surface water. Peterborough purchased the northern parcel for $140,000, in part because the owners threatened to bring suit against the town for the total diminution in value of their property caused by the contamination. ENSR also recommended the purchase of the northern parcel in order to permit the extension of the GMZ. See

14

id. After careful review of the record, the court finds and rules that a genuine issue of fact exists concerning whether such costs constituted "damages" to property under the CGL policy.

Accordingly, for the above-stated reasons, the court denies defendants' motion for summary judgment on the issue of whether certain costs and related investigatory costs constituted "damages" under the CGL policy.

Hartford next argues that the costs of closing the landfill are not covered under the policies because they are not caused by an "occurrence." Hartford argues that Peterborough seeks costs incurred pursuant to the standard closure of a municipal landfill, implemented pursuant to New Hampshire law requiring the closure of all landfills. Hartford notes that the Landfill Closure design states that its purpose is to close the landfill consistent with the applicable NHDES rules pertaining to the closure of landfills, "specifically, DES WMD Solid Waste Rules Env-Wm 312 'Universal Closure Standards', Env-Wm 2507 'Landfill Closure and Post Closure Standards' adopted July 1, 1991, and the May 1990 DES 'Guidance Document For The Closure Of Solid Waste Landfills In New Hampshire.'" Defendants' Motion at 20. According to defendant, the costs potentially incurred by Peterborough are costs that would have been incurred even if the site did not contain hazardous substances.

15

Although defendants' argument is not without merit, the court finds and rules that a material issue of fact exists.[5] Again, it appears that the landfill cap may have served dual purposes. This type of cap may have been required by the relevant administrative rules. But the record reveals that the cap may also have been established to aid in the cleanup of contamination which resulted from the dumping of hazardous waste at the dump site. The court further notes that defendants have not argued that from Peterborough's perspective the dumping itself was not an "occurrence." Instead, Hartford concedes that "there are genuine issues of material fact as to whether an 'occurrence' has taken place at the Site and whether the Town 'expected' or 'intended' property damage at the Site." Defendants' Motion at 21. Accordingly, the court finds and rules that the issue is best decided by the trier of fact.

## Conclusion

For the above-stated reasons, the court denies defendants' motion for summary judgment (document 85) in its entirety and

---

[5]Plaintiff argues that the closure is governed by another set of regulations. As it is unnecessary to decide this dispute in order to rule on defendants' motion for summary judgment, the court declines to give an opinion on the subject.

16

grants defendants' motion to file a reply document (document 88).

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

April 7, 1997

cc:    David W. Hess, Esq.
       Kevin M. Fitzgerald, Esq.
       Elizabeth M. Rice, Esq.

17