Burnes, J.
INTRODUCTION
This suit arises from a dispute over the duty to defend the plaintiffs Community TV Corporation and Harmon S.B. White (“White”) (collectively “Community TV”) under three different insurance policies in an action brought against Community TV by Eric Wolf (“Wolfj, a former employee of Community TV. The defendant is Twin City Fire Insurance Company, a *436 member of Hartford Insurance Company (“Hartford”). Community TV purchased three insurance policies from Hartford: the Commercial General Liability Coverage Policy (“CGL”), the Special Broad Form Endorsement to the CGL policy and the Umbrella Policy.
When Wolf sued, Hartford denied coverage under all three policies. Hartford argued that no claim of defamation or invasion of privacy was alleged in Wolfs administrative complaint or federal civil lawsuit, and, therefore, the CGL policy was not triggered, and that, since the discrimination by the Community TV employees was done intentionally, it properly denied coverage under the Special Broad Form Enforcement to the CGL Policy. Hartford also denied coverage under the Umbrella policy.
Hartford moves for summary judgment seeking a declaration that Hartford had no duty to defend or indemnify Community TV. Community TV cross moves for partial summary judgment seeking a declaration that Hartford was obligated to defend Community TV in both Wolfs administrative complaint and federal civil lawsuit.
FACTS
On or about October 23, 1992, Wolf filed a complaint (“the EEOC filing”) with the New Hampshire Commission for Human Rights (“the Commission”) and the Equal Employment Opportunity Commission (“EEOC”). In his EEOC filing, Wolf alleged that he had worked for Community TV, a New Hampshire corporation, from June 1989 through October 15, 1992. Wolf further alleged that during the time he worked at Community TV, he was discriminated against on the basis of his religion (Jehovah’s Witness) and gender. Among other things, Wolfs supervisor and co-workers at Community TV allegedly:
—hung a pornographic picture in Wolfs work area;
—made degrading comments to Wolf regarding his sexual practices, such as, “[h]ave you ever got caught masturbating in a closet”;
—passed around pornographic magazines; and
—brought a naked blow up doll into work.
On or about June 16,1998, the Commission issued a finding of probable cause and ordered the parties to submit conciliation proposals. Wolfs July 6, 1998, conciliation proposal reiterated that during the years 1990 through 1992, Wolf “was repeatedly presented with sexually provocative materials, and subjected to obscene and profane comments, jokes and gestures . . .” Wolf further alleged that after he left Community TV, Community TV employees spread a rumor in Wolf s community that he was a “holy roller” who had been fired. Wolf, specifically alleged that his compensatoiy damages included emotional distress and damage to his reputation.
In late 1998, Wolf requested and received a right to sue letter from the EEOC. On or about December 28, 1998, Wolf filed suit against Community TV and White in the United States District Court for the District of New Hampshire. Wolf v. Community TV Corporation and Harmon White, C.A. No. 98-704-JD.
On or about July 31, 1998, Community TV, through their insurance broker, put Hartford on notice of Wolf s EEOC filing and provided Hartford with copies of Wolfs EEOC filing and conciliation proposal. On or about January 7, 1999, Community TV, through their counsel, put Hartford on notice that Wolf had commenced a federal civil action against them and provided Hartford with a copy of the complaint. On or about January 18, 1999, Hartford notified Community TV that Hartford was denying coverage under their policies.
On or about June 15, 1999, Community TV entered into a settlement agreement with Wolf. The settlement agreement required Community TV to pay $87,500.00 to Wolf. Pursuant to the Statement of Damages submitted by Community TV when it filed this action, Community TV incurred $50,000.00 in attorneys fees in the underlying action.
At all times between August 20, 1990 through August 20, 1993, Community TV was insured under a Hartford CGL policy which provided coverage up to $1,000,000.00 per occurrence. The CGL policy was issued by Twin City Fire Insurance Company (“Twin City”), a member of the Hartford Insurance Group. Section I, Coverage B of the CGL policy provides for “personal and advertising injury liability.” The personal injury portion of the policy states that “[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of ‘personal injury’... to which this coverage part applies. We will have the right and duty to defend any ‘suit’ seeking those damages.” Under Coverage B(l)(b)(l), this insurance applies to (1) “(p)ersonal injury” caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you; . . . but only if the offense was committed in the ‘coverage territory’ during the policy period." Section II of the CGL policy defines who is an insured. Section II, subsection (l)(c) states that if the entity is “(a]n organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.”
The pertinent definition of “personal injury” under the CGL policy is “injury, other than ‘bodily injury,’ arising out of one or more of the following offenses; d. [o]ral or written publication of material that slanders or libels a person or organization . . .; or e. [o]ral or written publication of material that violates a person’s right of privacy.” The CGL policy coverage was extended by the Special Broad Form Endorsement. This endorsement added to and incorporated the following definition of “personal injury” into the policy. Subsec *437 tion f. under the definition of “personal injury” states that coverage will be provided by Hartford when there is “[d]iscrimination or humiliation that results in injury to the feelings or reputation of a natural person, but only if such discrimination or humiliation is: (1) [n]ot done intentionally by or at the direction of: (a) [t]he insured; or (b) [a]ny executive officer, director, stockholder, partner or member of the insured ...”
Community TV also purchased an Umbrella policy from Hartford which provides that “[w]e will pay those sums that the ‘insured’ must legally pay as ‘damages’ in excess of the ‘underlying insurance,’ or of the ‘self insured retention’ when no ‘underlying insurance’ applies, because of ‘bodily injury,’ ‘property damage,’ ‘personal injury’ or ‘advertising injury’ to which this insurance applies caused by an ‘occurrence.’ ” The same language found in Sections d., e., and f., as stated above, concerning “personal injury” claims was also included in the Umbrella policy.
DISCUSSION
Summary Judgment Standard
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Comm'r of Corr., 390 Mass. 419, 422 (1983).
There are no issues of material fact in this case. The facts established by the Statement of Facts and exhibits are undisputed. The disputed issue involves whether the applicable terms found in the CGL, Special Broad Form Endorsement to the CGL policy and/or the Umbrella Policy, issued by Hartford to Community TV, apply to the undisputed facts in this case. This is clearly a question of law for the Court to decide and, therefore, summary judgment is appropriate. Id.
New Hampshire Law Is Applicable
In determining which state’s law applies in interpreting an insurance policy, Massachusetts courts have adopted the “most significant relationship” analysis of the Restatement (Second) of Conflicts of Law. The Aetna Cas. & Sur. Co. v. Clasby, 788 F.Sup. 61, 64 (D.Mass. 1991). The Restatement (Second) of Conflicts of Law §188(2] (1992) provides five generally significant contacts with regard to contracts: the place of contracting, negotiation and performance, the location of the subject matter of the contract, and the domicile of the contracting parties. Id. In this case, the place of contracting was New Hampshire. The insurance policy was issued by a New Hampshire agent to a New Hampshire corporation, whose operations were based in New Hampshire. The subject matter of the contract was the issuance of insurance coverage for a New Hampshire corporation. Therefore, New Hampshire law applies.
Duty to Defend
The duly to defend is much broader than the duty to indemnify. See Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass 7, 10 (1989). “(T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are ‘reasonably susceptible’ of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense . . . [T]he process is one of envisaging what kinds of losses may be proved as lying within the range of allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.” Sterilite Corp. v. Cont’l Cas. Co., 17 Mass.App.Ct. 316, 318 (1983). In comparing the allegations and underlying facts to the terms of the policy,
[T]he insurer’s obligation is not merely to defend in cases of perfect declarations, but also in cases where by any reasonable intendment of the pleadings liability of the insured can be inferred, and neither ambiguity, inconsistency, nor duplicity in the [underlying plaintiffs] complaint can justify escape of the insurer from its obligation to defend.
Happy House Amusement, Inc. v. New Hampshire Ins. Co., 609 A.2d 1231, 1232 (N.H. 1992), quoting 14 M. Rhodes, Couch on Insurance 2d §51:49 (rev. ed. 1982). In the “case of doubt as to whether or not the complaint against the insured alleged liability of the insurer under the policy, the doubt must be resolved in the insured’s favor.” Id. at 1232-33.
In both Wolfs administrative complaint and the federal civil lawsuit, Wolf alleged he was demoralized by his supervisor and co-workers, endured outrageous and distasteful remarks about his religion, his personal conduct and his wife, and suffered sex, gender and religious discrimination. The Court finds these allegations, coupled with the detailed facts stated in the conciliation proposal, were “reasonably susceptible” of falling within the terms of the Hartford policies which triggered Hartford’s duty to defend Community TV. Since the allegations fell within certain provisions of the policies, Hartford had a duty to defend the entire suit. See Titan Holdings Syndicate, Inc. v. City of Keene, 898 F.2d 265, 269 (1st Cir. 1990).
Personal Injury Alleged
Reading the administrative complaint, the federal civil lawsuit and the conciliation proposal together, Hartford should have recognized that Wolf alleged sufficient “personal injury” which triggered Hartford’s duty to defend Community TV.
A. Defamation
Subsection d. of the Hartford CGL policy provides coverage for allegations of injury arising out of “oral or written publication of material that slanders or libels *438 a person . . .” New Hampshire has adopted the Restatement (Second) ofTorts §559 which states that “[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.” R. McNamara, 8 N.H. Prac., Personal Injury, Tort and Insurance Practice, §3 at 4 (1996 & 2000 supp.). ‘To establish defamation, there must be evidence that a defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third parly.” Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 635 A.2d 487, 492 (N.H. 1993).
Although Wolf may not have expressly alleged defamation as a cause of action in his administrative complaint or his federal law suit, the facts Wolf did allege, coupled with Wolfs conciliation proposal, which were presented to Hartford prior to Hartford denying their duty to defend, were enough so that the allegations taken together were “reasonably susceptible” of stating a claim for defamation which triggered coverage under Hartford’s policies. See Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 12 (1989).
The defamatory statements made by Wolfs supervisor and co-workers concerning Wolfs religion, personal conduct and family were sufficient to lower Wolf in the esteem of his co-workers. Further, the statements tended to injure Wolfs reputation among his colleagues and exposed him to ridicule. See Fitzgerald v. Town of Kingston, 13 F.Sup.2d 119, 126 (D.Mass. 1998). The statements lessened Wolfs reputation and lowered him in the estimation of his colleagues and thus “arguably [fell] within the ambit” of Hartford’s insurance coverage for defamation. The P.J. Noyes Co. v. Am. Motorists Ins. Co., 855 F.Sup. 492, 494-95 (D.N.H. 1994). Therefore, since any questions concerning whether insurance coverage applies is resolved in favor of the insured, Hartford should have defended Community TV in the actions by Wolf. Id. at 494.
Wolf alleged in the conciliation proposal that after he left Community TV, Community TV employees spread rumors in his community that he was a "holy roller” who had been fired. Although this allegation did not appear in Wolfs complaint or federal civil suit, it was presented to Hartford and known by Hartford before Hartford denied coverage. See M. Mooney Corp. v. United States Fid. & Guar. Co., 618 A.2d 793, 796-97 (N.H. 1992); Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10-11 (1989) (insurer required to defend under defamation liability policy where complaint on its face alleged only breach of contract, but additional facts known to insurer indicated plaintiff had alleged harm to reputation).
There “is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage.” Sterilite Corp. v. Cont’l Cas. Co., 17 Mass.App.Ct. 316, 319 (1983). Hartford should have inferred that the supervisor’s and coworkers’ words and actions “arguably [fell] within the ambit” of coverage for defamation which triggered Hartford’s duty to defend. The P.J. Noyes Co. v. Am. Motorists Ins. Co., 855 F.Sup. 492, 494-95 (D.N.H. 1994).
B. Invasion of Privacy
Communily TV’s CGL policy with Hartford also obligated Hartford to defend suits against Communily TV which sought damages arising from “[o]ral or written publication of material that violates a person’s right of privacy.” Under the Restatement (Second) of Torts, §652B, in order to state a claim under this tort theory of invasion of privacy, the plaintiff must show that the defendant intruded upon his or her “solitude or seclusion . . . or . . . private affairs” and that the intrusion would be “highly offensive to a reasonable person.” Restatement, at §625B.
Under New Hampshire law, one of the four types of invasion of privacy includes “the intrusion upon the plaintiffs physical and mental solitude or seclusion ...” This cause of action requires the “invasion of something secret, secluded or private pertaining to the plaintiff.” Hamberger v. Eastman, 206 A.2d 239, 241 (N.H. 1964). It does not depend upon publicity nor does it require falsity or fiction. Id.
In both the administrative complaint and the federal civil lawsuit, Wolf alleged that his supervisor and co-workers made degrading and demoralizing comments to him such as “ ‘[h]ave you ever got caught masturbating in a closet’ and sexual comments about [his] wife such as, ‘I was with your wife last night.’ ” Hartford should have reasonably determined that the actions of Community TVs employees “pried or intruded into the plaintiff)» sex [Ufe] in an offensive or objectionable manner and thereby invaded [his] right of privacy.” Busby v. Truswal Sys. Corp., 551 So.2d 322, 324 (Ala. 1989). The employees’ conduct was “not the kind of conduct tolerated in a civilized society and [their] conduct resulted in serious mental injuiy to [Wolf].” Pease v. Alford Photo Indus., Inc., 667 F.Sup. 1188, 1203 (W.D.Tenn. 1987).
The comments made to Wolf were pubUshed and thus satisfy any pubücation requirements for invasion of privacy. See Ellis v. Safety Ins. Co., 41 Mass.App.Ct. 630, 636 (1988), citing Brauer v. Globe Newspaper Co., 351 Mass. 53, 56 (1966). The comments did not have to be pubUshed in a sense of making the comments known to a large number of people. PubUcation was satisfied when the obscene, profane and degrading statements, by the supervisor and co-workers, were “communicated to at least a single individual other than the person defamed.” Id. at 636.
Hartford’s reliance on the facts in Transamerica Ins. Co. v. KMS Patriots L.P., 52 Mass.App.Ct. 189 (2001), is without merit. The allegations in Wolfs administra *439 tive complaint, federal civil action and conciliation proposal were significantly more intrusive than those outlined in Transamerica Ins. Co. Hartford was fully informed of the circumstances surrounding Wolfs allegations before Hartford completely denied coverage.
C. Discrimination and Executive Officer
Subsection f. under “personal injury” in the Special Broad Form Endorsement to the CGL policy required Hartford to provide coverage for discrimination or humiliation so long as the acts were not done intentionally by or at the direction of the insured or executive officer.
In both the administrative complaint and the federal civil lawsuit, Wolf repeatedly and consistently alleged that he was a victim of discrimination on the basis of his sex and religion. Wolf alleged that he was the target of humiliation when his supervisor and co-workers brought a blow up doll in work, showed Wolf nude pictures and used vulgar and obscene language knowing it would offend Wolf because of his religious beliefs.
The Court recognizes that Hartford’s Special Broad Form Endorsement to the CGL policy under subsection f. excludes coverage for discrimination or humiliation when it is done intentionally by or at the direction of the insured or any executive officer, director, stockholder, partner ..." The record does not establish whether Wolfs co-workers or supervisor fall within the definition of an “insured.” According to the policy, an insured is “[a]n organization other than a partnership or joint venture ... Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors . . .”
It does not appear that Wolfs supervisor or his co-workers fall under the definition of “executive officer.” “Executive officer” is not expressly defined in the Hartford CGL policy or in the Special Broad Form Endorsement, but it is defined in Hartford’s Umbrella policy as “a person holding any of the officer positions created by your charter, constitution or by laws.”
It is unclear from the record whether the general manager falls into the category of an “executive officer.” If the general manager was an “executive officer,” then it may be necessary to schedule a hearing to determine the amount Hartford must indemnify Community TV up until Wolf spoke with the general manager. See Newell-Blais Post #443, Veterans of Foreign Wars of the United States, Inc. v. The Shelby Mut. Ins. Co., 396 Mass. 633, 638 (1986). Whatever the general manager’s status was, however, it does not affect the duty to defend. See Titan Holdings Syndicate, Inc. v. City of Keene, 898 F.2d 265, 269 (1st Cir. 1990) (holding that once one allegation in the complaint falls within the policy terms, the insurance company has a duty to defend the entire suit).
D. Umbrella Policy
Although Community TV also purchased an additional, separate Umbrella policy from Hartford, which is broader than the CGL policy, the Court finds it unnecessary to analyze the applicable sections of that policy since Hartford’s duty to defend was established and triggered under the CGL policy and the Special Broad Form Endorsement. The CGL policy provides coverage in the amount of $1,000,000.00 per occurrence. Community TV settled its dispute with Wolf for $87,500.00. In defending that suit, Community TV incurred approximately $50,000.00 in attorney fees. The combined total of Wolfs settlement amount and the reasonable cost of attorneys fees are well under the $1,000,000.00 cap under the CGL policy. Therefore, it is unnecessaiy to analyze the Umbrella policy, since it would only be triggered if coverage was denied under the CGL policy, or if the amount of damages was in excess of the policy amount provided for under the CGL policy.
Hartford’s Defense
Hartford argues that neither the complaint nor the federal civil suit specifically alleged defamation or invasion of privacy and, therefore, Hartford did not have a duty to defend Community TV. Where a complaint is so general as to encompass a wide range of possible scenarios, the “possibility that the liability claim falls within the insurance coverage” is enough to trigger the duty to defend. Sterilite Corp. v. Cont’l Cos. Co., 17 Mass.App.Ct, 316, 319 (1983).
Even though the complaint and federal civil lawsuit may not have fallen within the express terms of Hartford’s insurance policy, the policy did not expressly preclude coverage either. Hartford should have looked beyond the pleadings to the more specific conciliation proposal and determined they had a duty to defend Community TV. See Happy House Amusement, Inc., v. New Hampshire Ins. Co., 609 A.2d 1231, 1232 (N.H. 1992). Any doubt as to whether insurance coverage is invoked must be resolved in favor of the insured. Id. at 1232-33. Hartford should have been aware of potential claims for discrimination, defamation and/or invasion of privacy. Because any confusion over whether coverage is triggered is decided in favor of the insured, Hartford had a duly to defend Wolfs charges on behalf of Community TV.
ORDER
For the foregoing reasons, it is hereby ORDERED that partial summary judgment be entered for the plaintiffs. The court finds and declares that Hartford had a duty to defend Community TV in the administrative action and the federal civil lawsuit brought by Wolf. Hartford’s motion for summary judgment is denied. The Court will schedule a hearing to determine the amount Hartford must indemnify Community TV.